## THE THAMES.

### BERNIER v. PHIPPS et al.

(Circuit Court of Appeals, Fourth Circuit.   May 22, 1894.)

No. 61.

**SHIPPING—INJURIES TO CARGO—SEAWORTHINESS.**

A cargo of flour shipped from Baltimore to Rio on the steamer Thames was badly damaged by water which leaked through the deck.   The deck rested upon iron beams, 3 feet apart, extending across the ship, braced by iron plates half an inch thick and 15 inches wide, laid diagonally across them, and bolted to them.   The deck planks were not grooved where they crossed these plates, as required by rule of Lloyds, so that they should rest solidly on the beams; but thin pads of wood were laid on the beams to keep the planks from sagging between the diagonal plates, which were nine feet apart.   It was shown that the deck did sag, nevertheless, thereby continually working out the calking, and that several cargoes before the one in question were damaged by water.   *Held*, that the ship was not seaworthy for the carriage of flour, and is liable for the consequent damage thereto.

**2. SAME.**

In the hold of an iron steamship bound from Baltimore to Rio, there were stowed 17,000 cases of kerosene oil; and on top of them, on a dunnage of one-inch pine boards, were stowed 5,000 barrels of flour.   When the ship reached Rio, it was found that all the flour was so saturated with the oil itself, or contaminated by its odor, that it was unfit for food.   The sweating in this hold was excessive, and much water leaked into it through the deck; but there was no means of ventilation, and the hold was not opened during the whole voyage, which consumed one month.   It was shown that oil and flour, in small quanties, could be shipped together without injury to the flour, but only when they were stowed in a hold which was perfectly dry and thoroughly ventilated.   *Held*, that the ship was not seaworthy for the carriage of such large quantities of flour and oil in juxtaposition, and she is liable for the consequent damage to the flour.

**3. SAME—STOWAGE—IMPROPER PLACE.**

Inasmuch as the master designates the place within the ship where each kind of cargo is to go, when such place is improper the ship is liable for consequent damages to the cargo, although it was stowed by the freighter's stevedore.

**4. SAME—BILL OF LADING—DAMAGE—NOTICE.**

The bill of lading under which flour was shipped required that notice of damage should be given the shipowner within three days after unloading. The unloading was completed January 31st, and notice of damage was given February 3d.   While the resulting survey was in progress, it was discovered that, in addition to damage by water, the flour was also damaged by the odor of oil shipped in the same hold, and another notice was given, and another survey ordered.   *Held*, that the original notice was in time to bind the ship for the whole damage.

**5. SAME—SEAWORTHINESS.**

When a well-known article of commerce is received on board ship, and carried on a voyage, the master guaranties the seaworthiness of the ship for the carriage of that particular cargo.

Appeal from the District Court of the United States for the District of Maryland.

This was a libel by J. L. Phipps & Co. against the steamship Thames (J. E. Bernier, master), in which there was a decree for libelants, and respondent appeals.

George B. Adams, for appellant.

Stewart Brown and Frederick W. Brune, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge. This is an appeal from a decree in admiralty from the district court of Maryland. The decree awarded the libelants damages, to the amount of $16,185 and costs, suffered on a shipment of 5,000 barrels of flour from Baltimore to Rio de Janeiro in the winter of 1890-91. The questions of fact arising in the case are very numerous, and they have been strenuously contested at every point. The evidence taken is unusually voluminous. The briefs are elaborate and litigious. The work of examining it all minutely has been laborious, protracted, and tedious. The case itself is a case of facts. It turns upon facts, and involves few contested points of law. It would be impracticable to present a full dissection and analysis of the evidence. The court must content itself with setting out, in the form mainly of narrative, *as* the facts of the case, those which it considers to be established by the preponderance of testimony.

The steamer Thames (J. E. Bernier, master) was a ship of 1,064 tons net, and 1,658 tons gross, 282 feet in length, and 34 feet beam. She was an iron ship, well built, and exceptionally strong and staunch, as to the hull. Her between decks had been partially fitted for passengers when first built, but she had been altered in this respect, the passenger accommodations, and the ventilators necessary to them, having been taken out. She had been converted into a ship exclusively for freight, without provision for ventilation in the hold, and in most of the between decks. The libelants, who are merchants of New York; the house of Phipps Bros. & Co., who were the consignees of the flour at Rio; and the master of the steamer,—were all British subjects; and the steamer was a British ship, flying the British flag. The flour under consideration was a part of the cargo of general merchandise which was taken on board the iron steamer Thames, partly in New York and partly in Baltimore, for shipment to Rio de Janeiro and Santos, in Brazil. The flour was taken on in Baltimore for shipment to Rio. The Thames left Baltimore on the 26th December, 1890. There were only two or three days of high wind during the voyage, and no casualties. She reached Rio on the 23d January, 1891. The flour remained on board ship until the 26th. The work of discharging it, and transferring it to a bonded warehouse in Rio, called there the "Trapische Damaio," was begun on the 26th, and completed at the end of the 31st. The consignees in Rio were the house of Phipps Bros. & Co. The agent of the owners of the steamer there was the house of Berla & Co. The cargo of the steamer, on this voyage, consisted largely of kerosene oil. This was shipped in cases, each case embracing two cans. The amount shipped was 17,000 cases or 34,000 cans of oil. This was all stowed in the hold of the steamer. The stevedore, Everett, who stowed this large quantity of oil and the rest of the general cargo of merchandise on the Thames in New York, also stowed the 5,000 barrels of flour taken on at Baltimore. The flour was stowed on top of the oil, in close juxtaposition,

on dunnage of pine boards, an inch thick and less, laid upon the oil. The compartment containing these articles was without ventilators. The voyage was across both tropics and the equator. The ship was in the torrid zone for some 20 days, under a vertical sun, in the hot season. The deck, under a blazing sun, had to be wetted daily; and it is probable that, unless the material of the deck was thoroughly seasoned, there was more or less of shrinkage, and of opening of the seams of the deck. The flour and oil under this deck were not examined during the entire voyage. On being discharged from the ship at Rio, the flour was found to be very considerably damaged. The agents of the steamer at Rio, Berla & Co., were made cognizant of the damage. Two surveys were called,—one composed of English subjects, and the other of residents, who were of other nationalities. Both of these surveys reported, in succession, that 1,872 barrels of flour were damaged by water, and all of the flour contaminated by the odor of kerosene oil; all damaged, from one cause or both, to such degree as to be unfit for use as bread. The flour was accordingly condemned, and, with the apparent concurrence of all in Rio who were concerned, was ordered to be sold. The sale was in due course made, and resulted in a loss indicated by the damages decreed by the court below. The libel charges that this damage resulted from the causes, and was of the character, indicated by the following of its clauses, which charge that the steamship was unseaworthy, and unfit for the said voyage, in these particulars, viz.:

"(a) That her decks were improperly constructed, and leaked, and let in water, into the hold and the between decks, from the sea, and when it rained, and whenever the decks were washed down, and, further, that there was a leak in said vessel, around or about the hawse pipe, through which water reached the cargo, and there were other leaks and defects in the hull of said vessel at the commencement of, and on, said voyage; (b) that she was improperly and too heavily laden, and trimmed so that she shipped more water over her decks, even in fair weather, than she should have taken in; (c) that she was insufficiently ventilated, and had no provision for such ventilation as was required for the cargo carried on that voyage; and (d) that she was improperly stowed for this voyage, and with this cargo.

"And they further say that the said cargo was negligently, improperly, and badly stowed on this voyage, in this: (a) In placing said flour and kerosene oil in juxtaposition; (b) in placing said flour and kerosene oil at all in the same compartments of said vessel, or its hold, with insufficient protection or dunnage between them; (c) in so stowing said flour and said kerosene oil in the same compartments or hold, where there was no proper provision made for ventilation.

"And libelants further say that by reason of the leakage of the decks of said vessel, and the leak around or about the hawse pipe, and by reason of the other leaks and defects in the hull of said vessel as aforesaid, sea water and rain water, and water used in washing down the decks, found its way into the hold, and between decks of said vessel, where the cargo of flour was stowed; and the said flour was damaged thereby, and rendered unsalable, the barrels being wetted and stained, and the flour in the barrels being caked and soured, and that about (2,000) two thousand of said barrels of flour were thus damaged by water. In addition to the said damage by water, libelants further say that the whole of said cargo of flour was—by reason of the improper manner of stowage above described, of the flour and kerosene oil in juxtaposition, or in the same compartments or hold, and by the lack of proper ventilation, or, indeed, of any ventilation—badly damaged by the smell of said kerosene oil, which permeated the same, rendering it offensive and unmerchantable, besides which some of said flour was damaged by leakage of said kerosene oil, and actual contact therewith."

The Thames had been repaired in Liverpool, in June, 1890, with a new deck. This work had been done under the supervision of the Lloyds. After the repairs were completed, she had been surveyed by two of the Lloyds' surveying agents, and passed by them as an iron steamer of the highest class. The weight of evidence and the result of trial established the fact, however, that the new deck which has been mentioned was defectively constructed. The deck was made of pine planks four inches thick, and of the usual width. The weight of evidence is that it was of sound material, fairly well seasoned. The fault consisted in the manner in which the deck was placed upon the irons of the ship on which they were to rest. The deck rests on iron beams laid about 3 feet apart. These are 3 to 4 inches thick by 6 to 8 inches wide (their dimensions are not distinctly stated in the evidence), set, of course, on edge, and extending across the ship at right angles with the line of the keel. These beams are braced by slabs of iron half an inch thick and about 15 inches wide, laid flat upon the upper edge of the beams, crossing and bolted to them diagonally, and reaching from the center of the deck to each side of the ship. They are called "diagonal plates" in the evidence. They are placed about 10 feet apart, from center to center. A rule of Lloyds requires that, "where diagonal plates are fitted on the beams, the deck planks [are] to be scored over the diagonal plates so as to fit close on the beams, thereby avoiding the use of wood pads" to elevate the beams to the level of the upper surface of the half-inch diagonal plates. These diagonal plates, half an inch thick, being bolted on top of the beams, prevent the deck planks from coming down flat upon the beams, unless they are notched or groved underneath diagonally over the diagonal plates, wherever they touch them, as required by the rule of Lloyds. The deck planks, when new, are four inches thick, and when let down, and bolted flat upon the beams, and notched or grooved out diagonally to fit over the diagonal plates and brace the structure, make a very firm deck, not easily strained and wrenched when the ship herself is under severe stress of the sea; one effect of such wrenching being to work the calking more or less gradually out of the seams of the deck. Obviously, too, a heavy deck resting upon those half-inch slabs of iron 15 inches wide, lying flat, 9 feet apart, and running diagonally across the beams, which form their own support, cannot be as firm and solid as if they rested on the beams themselves, and were grooved out underneath along the lines where they touch the thin plates, as required by Lloyds' rule. When the new deck was put upon the Thames, the rule of the Lloyds on this important subject was disregarded. The grooving plan was rejected and the padding plan adopted. The deck planks were not grooved and cut out over the diagonal plates, and let down firmly upon the beams, but were placed on the upper surface of the thin slabs which lay flatwise; and half-inch strips or pads of wood were laid over the top edges of the beams, to keep the deck from swagging in the space of 9 or 10 feet intervening between the slabs. It is in evidence that those thin wooden strips, in many instances, worked out of place, **leaving the deck to swag in the intervals between the diagonal**

plates; forming depressions for the retention of thin surfaces of water, and having the tendency to demoralize the calking, and to encourage occasional seepings of water through the seams of the deck, whether the water was from the sea washing over the deck, or from frequent wettings of the deck for cleanliness, or other purpose. The weight of testimony is that more or less calking was almost continually needed and going on during the several voyages of the Thames, made after the new deck had been constructed, anterior to that from Baltimore to Rio, to which this suit relates. The calking was omitted during this special voyage, but the omission rendered necessary a more or less thorough recalking of the deck from stem to stern, and beam's end to beam's end, while the steamer was lying at Rio. The experience of the Thames after leaving her dock at Liverpool condemns the deck which has been the subject of discussion. Her first voyage was from Swansea, Wales, to New Orleans, with a cargo of tin, part of which was damaged by water. Her next voyage was from New Orleans to Bremen, with cotton. This cargo was partially damaged by water, though not seriously. She then brought a cargo of sugar to New York from Hamburg, which was seriously damaged by water. Her next voyage after coming around from New York was from Baltimore to Rio, which is the subject of the suit now under trial, in which the damage from water affected more than 1,800 barrels of flour. The next voyage was from Rio to Philadelphia with coffee, in which the damage to cargo from water was the subject of heavy complaint. Recurring to the voyage from Baltimore to Rio, the testimony proves, beyond reasonable doubt, that, all during the voyage, water went down upon the cargo, not only through certain defective side apertures of the ship, but through seams in the general surface of the deck, from which the oakum had here and there worked itself out in consequence of the deck not resting flatly upon the beams, and not being notched over the diagonal plates which braced the beams, and which, if notched, would have braced the deck itself. The proofs show that the master of the Thames was aware that his deck leaked before he took on the 5,000 barrels of flour.

Passing now to the objection of libelants that the steamer was without provision for ventilation, and therefore unseaworthy as to perishable freights, the evidence shows that the hold of the Thames, like that of all iron steamers, was subject to excessive sweating, frequently so considerable that the water ran down the sides of the ship in streams. It shows that, for drying this heavy sweating, no ventilation was provided during the voyage, and could not be provided, on account of the omission of ventilators in the construction of the ship. With reference to this defect, much evidence was taken on the custom of shipping kerosene oil and flour in the same compartment of a ship. Nearly all the witnesses testify that the practice is objectionable to shippers generally, even when moderate quantities of oil or flour are shipped. In Baltimore it may be stated that objection is very strenuously urged against the practice by nearly all shippers, as well when the ships are well ventilated as when

they are not. This objection, however, is not generally pressed in New York, though even there pains are taken to mitigate the evils of putting oil and flour together, even in vessels adequately ventilated. Probably no instances can be cited—certainly, none were proved in this suit—of shipments of as much as 17,000 cases of oil and 5,000 barrels of flour in the same compartment of a ship, in close juxtaposition, in a large iron steamer having no appliances for ventilation, and subject to heavy sweating, for a voyage across the tropics in the middle of the hot season. It is proved in this suit that when oil and flour, in moderate quantities, are stowed together in the same compartments of well-ventilated iron steamers, under circumstances preventing the odor of the oil from incorporating itself into the flour by long and undisturbed contact, then, in such cases, when the flour is taken out of the ship, and exposed to the open air, the odor of the oil will pass off, and become imperceptible, in a few hours. But the hold of the Thames, having been closed against ventilation for 30 days in a tropical voyage, during which it was kept continually damp from the drippings of water through a defective deck, and by heavy sweatings from the sides of the iron ship, presents a very different case from any that was shown in the evidence taken in New York and Baltimore on this subject.

The question whether the libelant is not barred by the act of his own stevedore is well settled. If the stowing be improperly done, the freighter for whom he stows is responsible. But it is the practice for the master to designate where the cargo, and each part of it, is to go, and the stevedore must accept the places he designates. Then, if damage results from the designation of improper places for the several parcels of cargo, the ship is responsible. That the flour of the libelants, shipped on the Thames, was damaged by water and oil, does not admit of doubt. The reports of the two surveys called in Rio to make examination of its condition are emphatic on that subject. All the witnesses examined at Rio, several of whom had personal knowledge by inspection of the facts, corroborate the finding of the surveys. All parties at Rio, whether interested pro or con in the question, seemed to accept the fact of damage without question after the two surveys held at the Trapische Damaio, or bonded warehouse, had made their report. Expressions of some of the individual witnesses on the subject of damage to the flour are given as follows: One witness said:

"All the barrels, whether with or without external signs of damage, had a strong smell of kerosene oil, the effect of which was to vitiate the flour and render it almost unsalable."

The purchaser of the flour testified that:

"In its totality, the damage was from salt water and kerosene, some more, some less; all of them presenting signs of damages, and from part of the barrels not even one-third of the flour being fit to be employed."

Another witness said:

"All the 5,000 barrels smelled of kerosene, and were not damaged by being in contact with the oil itself. With the barrels that were damaged by water, the smell was fixed in the exterior part; with the sound barrels, the smell was mainly stronger in the center of the barrels."

A witness who saw the flour after its arrival at Rio said that the damage was—

"Caused by the leakage of the deck, and by kerosene being spilled on the barrels. The most of the barrels were black, and I could see the water dripping through the seams of the deck. The contents of some of the barrels were swelled, and the flour appeared through the broken staves like dough."

Other such statements could be given, if any doubt could remain of the flour being damaged to a degree that rendered it unmerchantable as an article of food.

It is complained in behalf of the appellant that the proceedings under which the condemnation and the sale of the flour at Rio were made were irregular, and not binding. There is, indeed, no affirmative proof that those proceedings were in accordance with the custom of that port, or of the ports of Portuguese countries generally. But the proceedings were, to all appearance, formal, regular, and valid, and they were acquiesced in as valid by the shipping and mercantile community in which they were had. There was no objection made by Berla & Co., the ship's agents, and nothing but a mere formal counter notice of protest was entered by Capt. Bernier against a protest of damage which had been made by the consignees of the flour. The general acquiescence, and this special silence, establish a practically conclusive inference of the regularity of the sale. The libel in this case was filed on the 6th day of June, 1891, and the decision below was rendered on the 7th day of April, 1893, after an interval of 20 months, or 22 months after the judicial sale complained of. Certainly a silent acquiescence in these proceedings by the claimant for so long a period, and failure to take affirmative evidence to invalidate the sale, operate potentially to confirm the inference of regularity already existing The court does not entertain a doubt but that the best interests of all parties to the transaction were subserved by the sale of the damaged flour that was made after its condition had been judicially determined.

It is contended by appellant that the notice of damage was not given within the three days prescribed by the bill of lading. The facts do not sustain this contention. The unloading of the ship, and transfer of the flour to the Trapische Damaio, were concluded on the night of the 31st of January, and the notice of damage, to Berla & Co., was given on the 3d of February. While the first survey was fulfilling its mission, and after it was discovered that the flour was damaged by the odor of oil, as well as by water, another notice was given to Berla & Co., and another survey ordered. We think the original notice of damage was in time to bind the ship.

It is competent, under the existing law of Great Britain, for common carriers on British ships of the goods of British subjects to exempt themselves, by express contract, from responsibility for losses occasioned by the negligence of their own servants. In the case at bar, it is contended that the Thames should not be held responsible for the damage to the flour, caused, as it was, by leakage and the odor of oil, inasmuch as the case falls within the terms of the bill of lading under which the flour was shipped. This might be a good

defense, if it were true. The third paragraph of the bill of lading[1] provides in its first clause that the carrier shall not be liable for damages occasioned by several causes, which it enumerates, even when produced by the negligence of the master and crew. The schedule of causes thus given does not include leakage, sweating, and smell, for damage to which the ship is made exempt by the second clause from liability in general, but not if it is the result of negligence on the part of her officers and crew. The question, therefore, in this case, simply resolves itself into the form whether or not the damage to the flour from odor and leakage was the result of negligence on the part of the master and owners, which is substantially the same as the main questions in the case, and depends upon them. These will now be examined:

Whether or not the steamer Thames was seaworthy, as to the leakage of her deck, is one of the important questions of the case, nearly 2,000 barrels of the libelants' flour having been damaged by that cause. It is difficult to believe that a staunch, tight deck could result from the manner in which this deck was constructed. The great and just reputation of Lloyds would seem to be at fault in this instance, in which its agents ignored a very important rule of its own enactment, though it may be a solitary one. It is not easy to divine how large, wooden, deck planks, laid and unsubstantially fastened down upon the flat sides of half inch slabs of iron, which themselves are laid diagonally, nine feet apart, upon the beams underlying the deck of the ship, could constitute a floor or deck sufficiently firm under the tread to prevent more or less springing of the floor, and solid enough to hold the calking from working out of the seams of the deck when the ship is in the buffets of the sea. Such a deck rests necessarily upon elastic supports. The beams of this ship were stout enough, but it is impracticable to brace slabs of iron, called here "diagonal plates," half an inch thick, fifteen inches wide, and laid flat and diagonally, nine feet apart, over the ship's beams, to receive the deck planks so as thereby to secure a firm, solid deck. The weight of proof is decided that the deck of the Thames did leak, not probably in every seam or square foot or square yard, but in every considerable part, and that this leakage,

---

[1] Third paragraph of bill of lading: "[First clause.] It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by cause beyond his control; by the perils of the sea, or other waters; by fire, from any cause, or wheresoever occurring; by jettison; by barratry of the master or crew; by enemies, pirates, or robbers; by arrest or restraint of princes, rulers, or people, riots, strikes, or stoppage of labor, or by claims of ownership by third parties; by explosion, bursting of boilers, breakage of shaft, or any latent defect in hull, machinery, or appurtenances, or unavoidable accident thereto by collisions, stranding, or other accidents of navigation, of whatsoever kind, even when occasioned by negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the said company. [Second clause.] Nor for heating, decay, putrefaction, evaporation, or smell from other goods, rust, vermin, sweat, change of character, drainage, leakage, rain, spray, breakage, or any loss or damage arising from the nature of the goods, or the insufficiency of packages; nor for land damage; nor for the obliteration, errors, insufficiency, or absence of marks, numbers, address, or description; nor for risk of craft, hulk, or transshipment; nor for any loss or damage caused by the prolongation of the voyage."

which was in the form of trickling, was almost constant when water passed over the deck, during the voyage. This constant cause of dampness in the hold reinforced the sweating of the iron hull throughout the voyage, and rendered the porous barrels of flour more susceptible to receive and retain the all-pervading odor of the oil than if the hold had been comparatively dry. The particular question here is whether or not, in respect to leakage, the Thames was a seaworthy ship for the carriage of the 5,000 barrels of flour which she had on board. The term "seaworthy" is relative. A ship leaky in her deck may be seaworthy for carrying stone, iron, coal, and very many other things even more valuable in respect to avoirdupois. But it cannot legitimately be contended that a ship is seaworthy, as to perishable articles, when it leaks in such a manner and degree as to cause damage to a very large proportion of such articles by a process plain to all on board, and obvious throughout the voyage; the damage to flour in this case showing itself, in several instances, in the form of paste oozing through the cracks of the barrels. A ship may be seaworthy as to one sort of cargo, and unseaworthy as to another. When a customary and well-known article of commerce is received on board ship, and carried on a voyage, the master guaranties the seaworthiness of his ship for taking charge of that article. As to her cargo, seaworthiness is that quality of a ship which fits it for carrying safely the particular merchandise which it takes on board. The ship is impliedly warranted to be seaworthy quoad that article, and, if damage occurs in consequence of the unfitness of the ship for carrying that article, the ship is liable, and cannot exonerate itself by proving the non sequitur that it is capable of carrying safely, and without damage, some other article of a different character.

Coming to the question whether or not this steamer was seaworthy for the purpose of carrying oil, and such a perishable article of food as flour, in the same compartment, without the flour being contaminated by the odor of the oil, here the meaning of the word "seaworthiness" is again to be discriminated. Small quantities of oil and flour may be stowed together with greater impunity than large quantities, as well in ventilated as unventilated compartments. Even very large quantities of oil may be carried in juxtaposition with flour, without permanent injury, if the compartment receiving them be well ventilated, whereas, if it be not ventilated at all, much smaller quantities of flour would be irretrievably ruined. The teaching of the evidence is that the odor of oil in flour, if the apartment in which they have been stowed together has been ventilated, generally passes off after longer or shorter exposure to the air. But the case at bar was a different one from any mentioned in the evidence. Here was the extraordinary quantity of 17,000 cases of oil placed directly underneath the extraordinary quantity of 5,000 barrels of flour. Here was a total absence of the instruments of ventilation, as well as a total neglect of inspection during the whole voyage. The two substances were stowed together in a hold that was always damp, and filled with a damp atmosphere from two joint causes,—the heavy sweating of the sides of the ship, and the

trickling leakage of the defective deck. The case at bar is out of the pale of comparison with any of the cases of the shipment of oil and flour in the same compartment, referred to in the evidence taken on this subject. No case was mentioned in the evidence of as large a shipment as 5,000 barrels of flour and 17,000 cases of oil having been put together in an entirely unventilated compartment. If such a usage as the shipment of these two commodities together was proved, it was done with reference to smaller shipments, and to ventilated vessels. Such an extraordinary case as the one at bar does not seem to have been in the minds of witnesses. The district judge found as facts, and summed up the evidence on this point, as follows:

"On the whole testimony, it appears that it is well known that although, on some steamers to South America, oil and flour were stowed in the same compartment, there were doubts as to its being proper stowage; and it appears that, when it had been done, it was in ventilated compartments, and with moderate quantities of oil, and that it had never before been done with a great quantity of oil, and in an entirely unventilated hold."

In respect to the manner of establishing a custom of shipping and stowing in vessels these two commercial substances, it is not sufficient merely to prove that more or less moderate quantities of flour and oil are habitually shipped in the same compartments of vessels. It is not sufficient to prove that large quantities are shipped in juxtaposition in well-ventilated ships. It is possible that there may be cases, distinguished by special circumstances, in which the courts would hesitate to hold that a ship was unseaworthy, for the purpose of carrying flour and kerosene oil in juxtaposition, merely for lack of ventilation. But the question, in every particular case, is on the circumstances which itself presents. In the case at bar the special, concrete, practical question is whether or not this steamer was, as to ventilation, a seaworthy ship for carrying, without damage from the pungent odor of oil, 5,000 barrels of flour stowed in close contact with 17,000 cases of kerosene oil, on a voyage from Baltimore to Rio de Janeiro, lasting a month, in the middle of the hot season, under a vertical sun, across both tropics. It was not the duty of the shipper, or of his stevedore, to look after ventilation. They do not traverse the seas or the tropics, or take thought of their effect upon cargoes. It was the duty of the master to put his ship and her appointments in such condition that the flour could be taken without damage on that particular voyage. Knowing, or presumed to know, all the conditions attending the voyage, the appellant received that flour, and designated the place of stowing it on his ship.

It is impossible to peruse the testimony describing the manner and degree of the damage which this flour sustained, and escape the conviction that, bad as the effect of the leakage of the deck was on a large portion of this flour, that resulting to all of it from the complete absence of ventilation was greater. In point of fact, most of the damage to the flour did accrue from want of ventilation. The flour did contract odor to a degree that rendered it not only unfit, but unsafe, to be eaten. It was formally condemned and sold as a damaged article. It was purchased, not for food, but for starch,

or some use other than of food. It was rejected by the firm which ordered it. The whole of it was refused because of the odor of oil, and about three-fifths of it for that reason alone. The ship was staunch. She accomplished her voyage safely and in good time. There was no casualty of the sea. Yet an immense mass of what had been as good flour as any known to the markets of the world was damaged; destructively damaged for food; damaged by the odor of the oil with which it was in contact; damaged from the absence of all provision of ventilation. How can this unseaworthiness, from the nonexistence of implements absolutely necessary to the proper equipment of the ship, be claimed to be a "peril of the sea?" It is plain to us that this ship, for the purpose of this voyage, and the safe carriage of this flour, in close contact with this great mass of oil, was unseaworthy, for the want of ventilation. We hold that the Thames, with its leaky deck, its absolute destitution of the means of ventilation, with its holds filled with 17,000 cases of kerosene oil and 5,000 barrels of flour, continually dampened by leakage and sweat, was unseaworthy for the carriage in sound condition of this flour in close juxtaposition with so great a mass of oil on a voyage across the tropics. The decree of the district court must be affirmed.

END OF CASES IN VOL. 61.