## THE JEANIE.

### ALASKA COAST CO. v. ALASKA PACIFIC FISHERIES.

(Circuit Court of Appeals, Ninth Circuit. September 5, 1916. Modified October 30, 1916.)

No. 2647.

1. SHIPPING ⊚⇒106—DAMAGE TO CARGO—CONTRACT OF AFFREIGHTMENT.

Where respondent's steamer, pursuant to an oral agreement, brought out shipments of salmon from libelant's canneries in Alaska, libelant was not bound by the terms of bills of lading delivered by the vessel to watchmen at the canneries, who were not shown to have authority to act for libelant in making the contracts of shipment.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 414–419; Dec. Dig. ⊚⇒106.]

2. SHIPPING ⊚⇒142—INJURY TO CARGO—SUIT FOR DAMAGES.

A stipulation by a vessel owner to enter its appearance and give security for the payment of any recovery in a suit contemplated by a shipper against the vessel for damage to cargo, made to prevent seizure of the vessel, *held* to have waived any claim that the suit was barred under the terms of the bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496; Dec. Dig. ⊚⇒142.]

3. SHIPPING ⊚⇒121(2)—DAMAGE TO CARGO—SEAWORTHINESS OF SHIP—"SEAWORTHY."

Whether a vessel is "seaworthy," as between owner and shipper, depends on whether she is reasonably fit to carry safely and without damage the particular cargo which she undertakes to transport.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 450, 451; Dec. Dig. ⊚⇒121(2).

For other definitions, see Words and Phrases, First and Second Series, Seaworthy.]

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. SHIPPING ☜121(2)—DAMAGE TO CARGO—SEAWORTHINESS OF SHIP.

A cargo of canned salmon in cases carried from Alaskan ports to Seattle by respondent's steamer was damaged by water and coal dust which reached the cases and soiled and rusted the cans. When the first part of the cargo was loaded, there was still some coal in the same hold, and nothing was done to keep them separate. The coal was afterward unloaded, but the hold was not thoroughly cleaned, and water also entered, some because of a loose plank, and some because of insufficient tarpaulins over the hatches. *Held*, that the vessel was not put in seaworthy condition for the cargo to be carried.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 450, 451; Dec. Dig. ☜121(2).]

5. SHIPPING ☜132(3)—DAMAGE TO CARGO—SEAWORTHINESS—BURDEN OF PROOF.

The burden of proving that damage to cargo from seawater which entered the vessel was due to perils of the sea rests upon the vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 479–481; Dec. Dig. ☜132(3).]

6. SHIPPING ☜137—DAMAGE TO CARGO—HARTER ACT.

Under the strict construction which it is the tendency of the courts to apply to Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 [Comp. St. 1913, § 8031], which exempts a shipowner who has exercised due diligence to make the vessel seaworthy and properly manned, equipped, and supplied from liability for damage resulting from faults or errors in navigation or management of the vessel, such section does not apply to acts connected with the stowage or handling of the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ☜137.]

7. SHIPPING ☜120—DAMAGE TO CARGO—LIABILITY OF SHIP.

A shipowner is not relieved from liability for loss or damage to cargo from perils of the sea, where his own fault or negligence contributed to such loss or damage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 440–448, 466; Dec. Dig. ☜120.]

8. SHIPPING ☜131—SUIT FOR DAMAGE TO CARGO—MEASURE OF DAMAGES.

Where a shipment of salmon was damaged when delivered to such extent that the cans had to be reconditioned before marketing, the shipper is entitled to recover the amount of his loss from a decline in the market price during the time necessarily required for such work.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 467; Dec. Dig. ☜131.]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in rem by the Alaska Pacific Fisheries against the steamship Jeanie, the Alaska Coast Company, claimant, to recover for damage to a shipment of canned salmon. Decree for libelant, and claimant appeals. Reversed.

For opinion below, see 225 Fed. 178.

The Jeanie was a wooden, steam vessel of about 1,000 tons burden and about 22 years old. On the voyage in question the vessel was under charter to W. F. Swan and W. C. Dawson, for trade between Seattle and Alaska points. The vessel left Seattle in December, 1912, on her north-bound voyage, with cargo, including coal in bulk, under the command of P. H. Karbbe as master.

The appellee was at that time the owner of three fish canneries in Southeastern Alaska; one situated at Chilkoot, on Chilkoot Inlet, another at Yes Bay, Behm Canal, and a third on Chomly Sound, Prince of Wales Island. These three canneries had been in operation during the packing season of 1912, packing salmon in cases. The canneries had ceased operations in October, having on hand a quantity of canned salmon ready for shipment and stored in the warehouses connected with the canneries. The cases were left in charge of a watchman at each of the canneries.

The Jeanie sailed north in December; was stranded overnight in the mud at Wrangell Narrows, but was pulled off by her own power at high tide on the following morning, and proceeded to Juneau, where a portion of the cargo of coal was discharged. In Alaska the master of the Jeanie received orders from Charles A. Burckhardt, at Seattle, the appellee's president and manager, to bring out the cases of salmon stored at the canneries mentioned. After leaving Juneau, the vessel proceeded north to Chilkoot, and on December 19, 1912, took on board from appellee's cannery a number of cases of salmon, for which the purser claims to have delivered to the watchman at the cannery a bill of lading or shipping receipt for 10,638 cases. This salmon was stored in No. 1 hold, which contained a quantity of coal in bulk. After leaving Chilkoot, the vessel returned south to Gypsum, but the weather and wharfage conditions were such that no cargo could be discharged at that port; and the vessel proceeded to Sitka, where a quantity of coal was discharged. An attempt was then made to proceed south to Sulzer by the outside passage, but heavy seas and wind caused the captain to turn through the inside passage to Ketchikan, where the remainder of the coal was discharged. Leaving Ketchikan, the vessel proceeded north and east through the Behm Canal to Yes Bay, where the holds of the vessel were cleaned out, and on December 30, 1912, salmon was taken on board from appellee's cannery at that point, for which the purser claims to have delivered to appellee's watchman a bill of lading for 14,027 cases. The vessel then proceeded south and west to Chomly, where on January 2, 1913, salmon was taken on board from appellee's cannery at that point, and the purser claims to have delivered to appellee's watchman a bill of lading for 5,000 cases, making the total number of cases taken from appellee's canneries at Chilkoot, Yes Bay, and Chomly 29,665, according to the bills of lading claimed to have been delivered by the purser. But whether such bills of lading were in fact delivered by the purser is a question of fact in the case. The cases actually received on board the vessel were in perfect good order and condition for shipment, but were not the number mentioned in the bills of lading. On January 3, 1913, the vessel sailed for Seattle, by the way of Ketchikan, meeting with severe storms on the way, and arriving at Seattle on January 8, 1913. Referring to this trip in a protest executed by him at Seattle on January 22, 1913, P. H. Karbbe, master, states: "During the entire trip south vessel experienced exceptional heavy weather, shipping tremendous quantities of water over her decks at times, the decks never being dry, either from the heavy seas or snow, and vessel leaked on the trip south considerably more than usual, necessitating keeping the pumps going more or less continuously."

A preliminary survey of the Jeanie had been made June 22, 1912, and a thorough survey made July 26, 1912, in dry dock. Certain repairs were recommended and made, and the vessel certified to be in good seaworthy condition and fit to carry dry and perishable cargo. No further repairs were made until September following, when some calking was done around the steam winches on the deck, and other minor repairs made. Some of the tarpaulins in use were old, perforated, and rotten, and did not prevent leakage of water into the interior of the vessel where the cargo was stored. There was no bulkhead between the salmon and the coal remaining on the vessel when the first salmon was taken on. During the voyage from Gypsum to Sitka a loose plank alongside the keelson was discovered in the lower forehold of the ship, in the middle of the hatch in the clear space between the salmon and the coal, that had been lifted up by the force of the bilge water and was lying to one side, which caused the water to wash out of the bilges and flood the salmon. This plank was replaced, and remained secure during the remainder of the voyage.

Upon the arrival of the vessel at Seattle on January 8, 1913, it was found

that the exterior of a number of the cans was damaged by water and coal dust, and the entire cargo was overhauled. The number of cases from Chilkoot was found to be 10,745, from Yes Bay, 14,164, and from Chomly, 4,735, or a total of 29,644 instead of 29,665 as shown by the bills of lading. It was found necessary to recondition many of the cases, some being merely wiped off and relacquered, and some cleaned, relacquered, and relabeled; and the whole cargo, so far as necessary, was put in first-class, marketable condition, at an expense of $4,283.06.

The appellant having refused to pay for such overhauling, appellee settled the bill therefor on April 8, 1913, and was about to bring a libel in rem against the Jeanie to recover damages for the injury to the shipment, when an agreement in writing was entered into between the parties, dated April 7, 1913, under the terms of which it was agreed that appellant would "stand in the place of and accept services on behalf of the steamer Jeanie in connection with any claim against said steamer, and will at any time that the party of the second part may desire to commence litigation appear in court on behalf of said steamer, and will give security for the payment of any claim which may rightfully be due against said steamer, notwithstanding the fact that the steamer may not, at the time of the beginning of the suit, be within the jurisdiction of the court."

On September 29, 1913, the Alaska Pacific Fisheries filed its original libel, to recover for damage to the shipment, alleging: "That all of said damages were caused by the unseaworthiness of said vessel and by the bad stowage and by the want of proper dunnage thereof on board said vessel, and by the negligence, carelessness, improper conduct, and want of attention of the master, his mariners and servants, in loading said salmon in the hold of said vessel without having removed therefrom large quantities of coal and coal dust, and in failing and neglecting to keep the decks of said vessel properly calked, the hatches properly battened down during said voyage and in failing to keep the same covered with safe, adequate, and secure tarpaulins and in failing to maintain adequate pumps on said vessel and to operate the same and keep the water out of the bilges of said vessel and out of the hold of said vessel where said salmon was stowed, and in permitting the bilge water negligently allowed to collect and remain in said vessel from entering the hold where said salmon were stowed, whereby said salmon were permeated with coal dust and water and damaged as above alleged, and by not having delivered the same in good order and condition and free from damage."

Waiving formal seizure of the vessel, the Alaska Coast Company entered its appearance in the case and filed its claim for the vessel, together with stipulation in the sum of $15,000, with surety, for the release thereof; and later filed its answer on October 16, 1913, in which it set up the defense that prior to and at the time of the commencement of the voyage "the then owner of the said steamship Jeanie exercised due diligence to make said vessel in all respects seaworthy and properly manned, equipped, and supplied, * * * that at all the times mentioned in said libel the said steamship Jeanie was seaworthy, properly manned, equipped, and supplied, and that the damage to said merchandise, if any such damage occurred in said merchandise while it was aboard said vessel, was caused by extremely rough weather encountered on the said voyage, by perils of the sea, and by faults or errors in navigation or in the management of the said vessel on the said voyage."

On March 21, 1914, an amended libel was filed, containing all the material allegations of the first libel and a further allegation, as follows: "That during said period of delay and detention of said merchandise for necessary reconditioning of the same, the market price thereof declined, so that the difference in the market value thereof was the sum of $7,935.40 less at the time the work was completed than the value thereof on January 10, 1913, the date on which said merchandise was discharged from said steamship Jeanie, and the libelant sustained a loss, by reason of such diminished value, to the amount of $7,935.40."

An amended answer was filed March 25, 1914, repeating all the allegations and denials contained in the previous answer, and pleading, as an affirmative defense, the issuance to libelant of bills of lading or shipping receipts for the cargo and failure of libelant to comply with their terms in making claim

for its alleged damage and in bringing suit therefor. In its amended answer claimant alleged that: "The said bills of lading or shipping receipts constitute the agreement, or contract, between the libelant and the said steamer Jeanie for the carriage and delivery of said consignments of salmon. * * * That the said shipment of said salmon was accepted and carried under the conditions and stipulations contained in and on the back of said bills of lading or shipping receipts and not otherwise. * * * That it is provided in each of said bills of lading or shipping receipts, among other things, as follows: 'All claims for damage to or loss of any property to be presented to the carrier, or the nearest agent thereof within ten days from date of notice thereof—the arrival of vessel at port of place of discharge, or knowledge of the stranding or loss of vessel to be deemed notice—and that after sixty days from such date, no action, suit or proceeding in any court of justice shall be brought for any damage to or loss of said property, and a failure to present such claim within said ten days or to bring suit within said sixty days, shall be deemed a conclusive bar and release of all right to recover against the vessel or its master, said carrier or any of the stockholders thereof, for any damage or loss. The claim for loss or of damage to any of the said property shall be restricted to the cash value of same at the port of shipment, at the date of shipment.' That no claim was presented by this libelant, or by the said consignee, or by any one on their behalf to the carrier, or to any agent of the carrier, or to the said charterers, or to the said steamship, within 10 days after the arrival of vessel at port of discharge, nor was any action brought against the said steamship or her owners or her master or against the said charterers for the alleged loss or damage to the said goods within 60 days after the arrival of said vessel at port of discharge."

By the second amended libel, filed February 17, 1915, which in addition to the allegations of the former libels contained matter in the nature of a reply, it was alleged: "That it is not true that the several bills of lading set forth in said amended answer, or either of them, or any other bill of lading for any of the said shipments of salmon, were delivered to or accepted by this libelant; * * * and it is not true that the said shipments of salmon, or either of them, were accepted or carried under the conditions and stipulations contained in and on the back of said bills of lading. * * * That it is not true that no claim for the damage to said merchandise was presented by this libelant or by the said consignee or by any one in their behalf to the carrier or to any agent of the carrier, or to the said charterer or to the said steamship within 10 days after the arrival of the vessel at the port of discharge."

The District Court held that, as to the particular cargo in question at least, the vessel was unseaworthy; that there was an oral understanding between the parties with relation to the shipment of this cargo; and, while no terms appear to have been detailed or specially understood, liability could not be limited except by mutual consent; that as the bills of lading were not issued to any authoritative persons and there was no understanding with relation to them, the libelant could not be bound by their stipulations; that the master and crew did not use due care in protecting the cargo from the coal dust and water, and claimant cannot claim exemption under the provisions of section 3 of the Harter Act (27 Stat. 445); and that libelant was entitled to recover from claimant and United States Fidelity & Guaranty Company, as surety, the sum of $4,283.06 expended by the former in having the cargo overhauled and reconditioned, $7,935.00 for damage sustained as a result of decline in market value during the period during which the cargo was reconditioned, and interest and costs.

From this decree, claimant appeals.

W. H. Bogle, Carroll B. Graves, F. T. Merritt, and Lawrence Bogle, all of Seattle, Wash., for appellant.

C. H. Hanford and Kerr & McCord, all of Seattle, Wash., for appellee.

Before GILBERT and MORROW, Circuit Judges, and RUDKIN, District Judge.

MORROW, Circuit Judge (after stating the facts as above). 1. It is contended by the appellant that this suit cannot be maintained because the appellee did not, as required by the bills of lading, present to the appellant its claim for loss and damage within 10 days from the date of the arrival of the vessel at the port of discharge, and did not, within 60 days from such date, bring this suit for such loss and damage.

[1, 2] We are of the opinion that this objection to the action cannot be sustained: First. Because it does not appear from the evidence that such bills of lading, if delivered, were delivered to any person whose acceptance of the same bound the appellee. If, as claimed by the appellant, the bills of lading were delivered to the watchmen at the canneries, there is no evidence that these watchmen had, or assumed to have, any authority from the appellee to enter into any shipping contract with any officer of the vessel. No one signed the bills of lading for or on behalf of the appellee, and the order of the appellee's president and manager to the master of the vessel to bring out the salmon did not bind the appellee to the terms set forth in the forms of the bills of lading in use by the vessel. The evidence is not sufficient to establish an agreement with respect to such a limitation upon the carrier's liability. Second. Because it appears that on the 7th day of April, 1913, and after the appellee had by examination ascertained the damage to its cargo and the appellee was about to bring a suit in rem against the vessel to recover the loss and damage so ascertained, the parties entered into a stipulation, wherein it was recited, among other things, that subsequent to the arrival of appellant's vessel at Seattle on January 8, 1913, it was found that the cargo of salmon owned by the appellee had been more or less damaged on the voyage; that to avoid all unnecessary expenses in connection with any litigation in the determination of any liability for the loss of or damage to said salmon, in consideration of the sum of $1, paid by the appellant to the appellee, and the premises mentioned, the appellee would refrain from taking any legal proceedings in the matter of the protection of its claim by filing a libel against the steamer Jeanie, and the appellant on its part undertook and agreed that it would stand in the place of and accept services on behalf of the Jeanie in connection with any claim against said steamer, and would, at any time that the appellee might desire to commence litigation, appear in court on behalf of the said steamer and would give security for the payment of any claim which might rightfully be due against said steamer, notwithstanding the fact that the steamer might not, at the time of the beginning of the suit, be within the jurisdiction of the court. This stipulation, as a legal as well as a practical business transaction entered into for a valuable consideration, is inconsistent with the terms of limitation in the bills of lading under consideration, and must be deemed an admission that such terms did not exist or were waived by the appellant.

[3] 2. Whether the Jeanie was seaworthy for the transportation of appellee's cargo on the voyage under consideration depends upon the question whether she was "reasonably fit to carry the cargo which

she had undertaken to transport." The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 8 (43 L. Ed. 241). "As seaworthiness depends, not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry, or it is not seaworthy in that respect." The Southwark, 191 U. S. 1, 9, 24 Sup. Ct. 1, 4 (48 L. Ed. 65). "A ship may be seaworthy as to one sort of cargo and unseaworthy as to another. When a customary and well-known article of commerce is received on board ship and carried on a voyage, the master guarantees the seaworthiness of his ship for taking charge of that article. As to her cargo, seaworthiness is that quality of a ship which fits it for carrying safely the [particular] merchandise which it takes on board. A ship is impliedly warranted to be seaworthy quoad that article, and, if damage occurs in consequence of the unfitness of the ship for carrying that article, the ship is liable, and cannot exonerate itself by proving the non sequitur that it is capable of carrying safely and without damage, some other article of a different character." The Thames, 61 Fed. 1014, 1022, 10 C. C. A. 232, 240, cited by the Supreme Court in The Southwark, 191 U. S. 11, 24 Sup. Ct. 1, 48 L. Ed. 65. Whether a vessel is reasonably fit to carry her cargo, must be determined upon all the circumstances and evidence in the case. Int. Nav. Co. v. Farr, etc., Co., 181 U. S. 218, 224, 21 Sup. Ct. 591, 45 L. Ed. 830.

[4] The cargo which the appellant undertook to transport for the appellee consisted of 29,657 cases of canned salmon (13 short, leaving 29,644 cases delivered), all in good order and condition when received on board appellant's vessel; that is to say, they were in a clean and marketable condition. When delivered at Seattle, a large number of the cases were found in an unclean, damaged, and unmarketable condition by reason of having come in contact with coal dust mixed with water. This condition made it necessary to overhaul and examine the entire cargo, clean the cans that were covered with dirt and coal dust, clean and remove the rust from cans that had been wet and damaged by rust, relacquer such cans, and relabel a large number of cans where the labels had been damaged or removed. It appears from the evidence that previous to receiving appellee's cargo for transportation from Alaska to Seattle, a cargo of coal in bulk had been carried in the vessel and delivered at ports in Alaska, but a large quantity of coal remained in the vessel when the first shipment of appellee's cargo was received on board at Chilkoot, and between that cargo and the coal no bulkhead or other separating device was placed. Before the next shipment was received on board at Yes Bay, the coal had been discharged, and some effort made to clean the vessel, but that this cleaning had not been effective or thorough is evidenced by the fact that shipments received on board at Yes Bay and Chomly were also damaged by coal dust and water. It appears, further, that water, mixed with coal dust, accumulated in the hold of the vessel and, coming in contact with the cargo, injured and damaged the cans in the manner stated. Part of this water coming in contact with the

cargo is accounted for by a plank alongside the keelson coming loose and letting bilge water into the hold. The plank was replaced, but the water, mixed with coal dust, had probably reached the cargo. The wetting of the cargo is also accounted for by the rotten and perforated condition of some of the tarpaulins covering the hatches, through which the water penetrated, and, taking up the coal dust, washed it upon the cargo.

To have made this vessel seaworthy to carry this cargo, it was the duty of the carrier, before receiving the cargo, to have effectively separated the first shipment from the coal and to have cleaned the vessel thoroughly of coal dust, so that none of it would be carried by either air or water and deposited on the cargo, and it was the further duty of the carrier to furnish the vessel with sound and serviceable tarpaulins, and make the hatches water-tight against seas that might reasonably be expected to sweep over the vessel. It is contended on the part of the appellant that the water entered the vessel through a seam or crack between the deck and hatch coaming and other seams and cracks opened by the strain upon the vessel caused by the heavy weather encountered on the voyage. In other words, it is contended that the damage to the cargo was caused by perils of the sea.

[5] The burden of proving seaworthiness as against this cause of damage was upon the appellant (The Edwin I. Morrison, 153 U. S. 199, 212, 14 Sup. Ct. 823, 38 L. Ed. 688; The Southwark, 191 U. S. 1, 16, 24 Sup. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 389, 26 Sup. Ct. 467, 50 L. Ed. 794) with the presumption in favor of the appellee that it was the fault of the appellant. The Queen and cases there cited (D. C.) 78 Fed. 155, 171. We do not think that the appellant has overcome this presumption or maintained the burden of proof placed upon it. The presence of coal dust in the cargo has not been accounted for as a peril of the sea; on the contrary, its presence is accounted for by the fact that the previous cargo was coal, from which the first shipment of appellee's cargo was not sufficiently separated, and the dust of that cargo had not been sufficiently removed from the interior spaces of the vessel when the remainder of appellee's cargo was received on board. In that respect the vessel was not seaworthy for the transportation of that cargo. The presence of water in contact with the cargo is accounted for, in part, by the leaky condition of the tarpaulins covering the hatches and, in part, by a plank alongside the keelson coming loose and letting bilge water into the hold. The evidence is that this plank was replaced and continued in position during the remainder of the voyage. Why, then, did it come loose at all? It was after this plank had come loose and had been replaced that the vessel encountered the heavy seas and suffered the strain claimed by the appellant to have been the cause for the opened seams near the hatch and other places on deck, but the heavy seas and strain did not disturb this plank. If the strain was so great, why did this plank remain in position after having been replaced? Must we not conclude that it was not properly secured when the first shipment of appellee's cargo was taken on board, and, in this respect, that the vessel was not seaworthy for this cargo?

[6] But the appellant contends that, even if these charges be true, the vessel is not liable under the provisions of section 3 of the act of February 13, 1893 (Harter Act, 27 Stat. 445). That section provides, in substance, that, if the owner—

"shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel."

The trend of judicial decisions has been to construe this act strictly, and not to extend the carrier's exemption from liability to doubtful and uncertain cases. The tendency has been to leave the liability of the ship and the owner as it was defined and enforced by the law maritime and by the common law, unless the act plainly and unequivocally asserts a different liability. The Germanic, 124 Fed. 1, 5, 59 C. C. A. 521 (Circuit Court of Appeals, Second Circuit), affirmed in Supreme Court, Id., 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610. Under this rule of construction, it has been held that section 3 of the act is limited to faults primarily connected with the navigation or the management of the vessel and not with the cargo. Knott v. Botany Mills, 179 U. S. 69, 73, 74, 21 Sup. Ct. 30, 45 L. Ed. 90; The Germanic, 196 U. S. 589, 597, 25 Sup. Ct. 317, 49 L. Ed. 610.

In this case the faults relate to the unseaworthy condition of the vessel and the care and custody of the cargo, and not to the navigation and management of the vessel. There is no complaint that the vessel was not properly navigated or managed; the complaint is primarily that the vessel was unseaworthy, and that by the misconduct and negligence of the master and crew a large part of the cargo was improperly stored in the lower hold of the vessel without being separated from the coal, and that the remainder was not properly dunnaged to protect it from injury by contact with bilge water, that they were negligent in not keeping the hatches covered with safe, adequate and secure tarpaulins to prevent the water leaking through the hatches into the interior of the vessel, and were negligent and guilty of misconduct in leaving the whole of the interior space of the vessel in an unclean and unfit condition for the storage of the cargo by reason of the presence of coal dust. If we now examine sections 1 and 2 of the act, we find that liability for loss and damage arising from such neglect and misconduct as is here charged is a liability from which the shipowner is not relieved, and cannot be relieved, by any contract or agreement. Section 1 prohibits the shipowner from inserting in any bill of lading any clause, covenant, or agreement whereby he "shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care or proper delivery of any and all lawful merchandise or property committed to its or their charge;" and section 2 prohibits the shipowner from inserting in any bill of lading—

"any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence to properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master,

officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided."

[7] This brings us to the question whether, conceding all that the appellant claims for perils of the sea, the carrier is relieved from liability for loss or damage from such perils where the carrier has by his fault or negligence contributed to such loss or damage. In Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438, 9 Sup. Ct. 469, 470 (32 L. Ed. 788), the Supreme Court, commenting on the difference in liability on the part of the insurance company and the carrier with respect to loss and damage caused by perils of the sea, said:

"Collision or stranding is doubtless a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them. * * * But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held, an exception, in the bill of lading, of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed."

This decision was rendered in 1888, and prior to the Harter Act, but this act does not touch the law here declared, except in the navigation and management of the vessel; the obligation of the carrier with respect to the cargo remains the same. The Supreme Court cites the case of The Xantho, in the House of Lords, 12 App. Cas. 503, 510, 515. Lord Herschell, in that case, states that the true view with respect to the carrier's liability had been stated by Willes, J., in Grill v. General Iron Screw Collier Company, L. R. 1 C. P. 600, 611, as follows:

"I may say that a policy of insurance is an absolute contract to indemnify for loss by perils of the sea, and it is only necessary to see whether the loss comes within the terms of the contract, and is caused by perils of the sea; the fact that the loss is partly caused by things not distinctly perils of the sea does not prevent its coming within the contract. In the case of a bill of lading it is different, because there the contract is to carry with reasonable care, unless prevented by the excepted perils. If the goods are not carried with reasonable care, and are consequently lost by perils of the sea, it becomes necessary to reconcile the two parts of the instrument, and this is done by holding that if the loss through perils of the sea is caused by the previous default of the shipowner, he is liable for this breach of his covenant."

Upon the evidence in this case, the rule here stated fixes beyond question the liability upon the appellant for the loss and damage to appellee's cargo.

[8] 3. The court below awarded damages in favor of the appellee in the sum of $12,796.26, with interest at the rate of 6 per cent. per annum from the date of the decree. The total sum is made up in part by the sum of $4,283.06, paid by the appellee for the labor and material required to recondition the cargo, and interest on the sum so paid

amounting to $578.20. This expense was necessary to place the cargo in as good condition as when it was received on board the vessel. It appears to have been the usual and reasonable charge for such work, and was properly allowed. The total sum allowed in the decree includes the further sum of $7,935 for the depreciation in the market value of the cargo during the period required to place it in a marketable condition. The appellee was entitled to have its cargo delivered in a marketable condition when the vessel arrived on January 8, 1913. It appears from the evidence that on January 10, 1913, the market value was $85,630. It was not in a marketable condition, with an exception to be hereafter noticed, until March 20th, when it had been overhauled and reconditioned, and when the market value of the whole cargo had fallen to $77,695. The difference is the sum of $7,935, incorporated in the decree. It appears from the evidence that this difference arises out of a fall in the market value of 30 cents per case on 10,498 cases of salmon designated as "Chums," making a loss of $3,149.40, and a fall in the market value of $1 per case on 4,786 cases of salmon designated as "Medium Reds," making a loss in this quality of salmon of $4,786.00, and a total of $7,935.40 for both "Chums" and "Medium Reds." With respect to the remainder of the cargo, consisting of 14,373 cases of salmon designated as "Pinks," there was no fall in the market value.

It appears that appellee sold to the Pacific Commercial Company, at Manila, some time in the month of January, 1913, 5,500 cases of salmon designated as "Chums." The shipment was made on February 8, 1913, and it was found convenient to take this shipment from the reconditioned part of the cargo brought down by the Jeanie, instead of from the stock on hand. This salmon was then in a marketable condition, and delivered to the appellee for the market. What it sold for, the evidence does not disclose. The presumption is that it was sold for the price prevailing in January. In any event, the burden was clearly upon the appellee to prove the loss on this particular lot of salmon, if any there were, and it is not sufficient to say that this lot was merely substituted for an equal number of cases taken from the stock on hand, and that the loss was upon the like amount in stock, to be estimated as of March 20th. There was a market price for this quantity of salmon as of the date of its sale in January, and, in the absence of proof as to what that price was, we are of the opinion that a loss on this lot of salmon has not been proven, and that the estimated loss of 30 cents a case, making $1,650, should be deducted from the decree.

We are of the opinion that the overhauling of the entire cargo was necessary under all the circumstances, and that the expense incurred therefor was just and reasonable. The amount, $4,283.06, was promptly paid by the appellee, and it was entitled to interest charged thereon amounting to $578.20, or a total of $4,861.26. For the loss in the market price of the salmon, the lower court found the loss and damage to be the sum of $7,935. From this sum we find there should be deducted $1,650, leaving the damage on this account $6,285.00, or a

total of $11,146.26,[1] upon which sum interest shall be allowed to the date of the final decree to be entered herein.

The decree of the District Court will therefore be reversed, with directions to enter a decree in favor of the appellee for $11,146.26, with interest and costs, including costs on this appeal.