THE KOREA MARU.*

TOYO KISEN KAISHA et al. v. WILLITS et al.

(Circuit Court of Appeals, Ninth Circuit. August 1, 1921.)

No. 3610.

1. **Shipping** ☞141(1)—**Stipulation in bill of lading held not to absolve carrier from liability for negligence.**

In view of Comp. St. §§ 8029, 8030, stipulation in bill of lading reading, "Leakage of contents at owner's risk," does not absolve the carrier from liability arising from negligence or want of the exercise of due diligence in properly stowing cargo.

2. **Shipping** ☞132(5)—**Evidence held to prove negligent stowage.**

In action for damages sustained through partial loss by leakage from containers of cargo consisting of cocoanut oil shipped from Manila to San Francisco during the month of July, evidence *held* to establish neg-

---

ligence in stowage, in that the tank in which the cocoanut oil had been placed was not a suitable or proper place in which to stow the oil for carriage during such season of the year, was wholly without ventilation, and that by reason of its proximity to the engine room and emergency escapes extending through it, the heat in the tank was rendered excessive, which affected the oil and caused the leakage.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Edward E. Cushman, Judge.

Libel by Charles D. Willits and I. L. Patterson, copartners doing business under the firm name of Willits & Patterson, against the Toyo Kisen Kaisha, a corporation, as claimant of the Japanese steamship Korea Maru, her engines, boilers, boats, tackle, apparel, and furniture, and the United States Fidelity & Guaranty Company, her stipulator. Judgment for libelants, and defendants appeal. Affirmed.

Knight, Boland, Hutchinson & Christin and F. Eldred Boland, all of San Francisco, Cal., for appellants.

Edward J. McCutchen, Farnham P. Griffiths, and McCutchen, Willard, Mannon & Greene, all of San Francisco, Cal., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. Appellees are libelants, and are suing for damages which it is alleged they sustained through partial loss, by leakage from containers, of cargo consisting of cocoanut oil shipped from Manila to San Francisco on the steamer Korea Maru; Toyo Kisen Kaisha, claimant. The leakage is attributed to improper stowage. The shipment consisted of 542 barrels of cocoanut oil, 440 of which were stowed in what is known as No. 5 tank, and the balance, 102 barrels, in No. 7 hold. The barrels were of Douglas fir, possibly some of oak, and glued on the inside. There is some difference in the testimony as to their condition when the shipment was made. Some witnesses describe them as stained from oil seepage, and even leaking at the time they were taken aboard; but the better opinion is that they were in good condition, sound and tight, and showed no leakage at the time. The shipment was completed on July 7, 1917, and on the next day, the sailing date, the thermometer stood at 87 degrees; the season being the warmest of the year. It is stipulated that the oil at the time was in a liquid state, owing to the temperature. The weather continued very warm during the voyage, or the greater part of it, at least. When the oil was discharged at San Francisco, it was found that many of the barrels were in bad condition, some having the hoops off, and others with the staves and heads stove in, and in consequence a large quantity of the oil had escaped, and much of it had run out through the scuppers into the bilges, and was pumped into the sea. The leakage was much greater in No. 5 tank than in No. 7 hold.

T. Ota, the ship's captain, says that, upon arrival in San Francisco, the condition of the barrels in No. 5 was bad, "but on account of the thinness of the wood which made the barrels, the contents was all

perforated through the wood all over the barrels," and he further says the condition of the cargo in No. 7 hold was good; the inquiry being touching the oil shipment. The statement is inferentially corroborated by a letter written by U. Kondo, the chief officer of the ship.

W. E. Boyer, libelants' salesman, relates that the cargo that came out of No. 5 tank was in very bad condition; that the barrels were "leaking very badly," but that the barrels from No. 7 "were in good condition."

William F. Dunn, who was at the time in charge of the stevedoring for the Toyo Kisen Kaisha ships, testifies to the same purpose. On the other hand, three stevedores were called who testified that the condition of the barrels that came out of each of the holds was practically the same. We are impressed, however, as was the court below, that the stonger case is with the libelants on the disputed fact.

No. 5 tank, indicated on the blueprint plans of the ship as No. 5 orlop, is situated abaft and adjoining the engine room, and above the thrust recess. It is a part of No. 5 hold, but is partitioned off from it, so that it constitutes an entirely separate room or hold for the storage of cargo. The hatch opening for No. 5 hold extends over No. 5 tank, and the only access thereto for the deposit of cargo is through the extended hatchway above. The thrust recess is used in connection with the engine room, and is really a part of it. Passing up through No. 5 tank from the thrust recess are two emergency escapes, square in form, one on each side, to permit the men in the engine room to pass out that way to the upper decks in case their egress is otherwise cut off. These escapes are provided with doors or openings into No. 5 tank. They serve, not as ventilators for conducting air from the outside into No. 5 tank, or the thrust recess, or the engine room, but for giving vent outward from the engine room. The tank is separated from the thrust recess by a steel floor, and from the engine room by a steel bulkhead, with wood planking on the tank side, intended to give ventilation about the cargo in the tank.

Upon either side of No. 5 tank, and between it and the skin of the ship, are fresh-water tanks. These extend below the bottom of No. 5. The testimony tends to show that the only ventilation from the outside was through ventilators, extending into No. 5 hold and into the shaft alleys below, which extend into the thrust recess, for supplying fresh air to the men in the engine room. Ventilation carried into No. 5 hold could only affect No. 5 tank by contact with the steel partition between the hold and the tank. No. 7 hold is abaft No. 5 hold, with No. 6 intervening, and is provided with ventilators from the outside. The sole cargo in No. 5 tank consisted of oil in barrels. These barrels were deposited on their sides in three tiers, with dunnage about them to hold them in place. When the stowage was completed, hatch boards were placed over the tank, and other cargo, to the depth of about seven feet, was stowed upon and above the hatch boards. The barrels of oil in No. 7 hold were stowed in one tier at the bottom of the hold.

It is contended that No. 5 tank was not a suitable or proper place in which to stow the oil for carriage, especially in that season of the year;

that the tank was wholly without ventilation, and that, by reason of its proximity to the engine room, and the emergency escapes extending through it, the heat in the tank was rendered excessive, which affected the oil and caused the leakage complained of.

It can scarcely be questioned that there was no ventilation in No. 5 tank, except through the emergency escapes, and this was an "uptake," not an intake. The air passing from the engine room would naturally be heated more or less, and would have a tendency to raise the temperature in the tank rather than lower it. If the doors were open from the escape into the tank, the effect would be to further increase the temperature therein. The doors, however, were probably closed. The proximity of the engine room to the tank, with the steel bulkhead between, would also have some effect in raising the temperature. There is some testimony to the effect that, after the ship is at sea for a time, the fresh water being drawn out of the tanks is replaced with condensed water, which would be hot. If this were the case, the temperature in No. 5 tank would also be affected thereby. Some opinion estimates have been made respecting the degree of heat in the engine room while the ship was in motion—the estimates running from 90 to 115 degrees; it being thought that the heat in No. 5 tank would be from 15 to 20 degrees less.

Cocoanut oil congeals to a solid at 65 degrees, and liquefies fully at 75. When in a liquid state, its effect on wooden containers is to drive out the moisture and cause the wood to shrink, and the consensus of opinion is that the higher the temperature the greater will be the shrinkage, and that the effect is to allow the oil to escape more freely.

It is reasonably deducible, as a conclusion from the fact that the oil carried in No. 7 hold came through without considerable loss by reason of leakage from the containers, and that the loss from leakage was great in No. 5 tank, that the tank was not a suitable or proper place for the stowage of the oil in that season of the year. This conclusion is fortified by the testimony of Boyer, to the effect that his firm has imported cocoanut oil in barrels of like kind to those used on this occasion, and that the oil came through in good order and condition. Among three ships he names is the Melville Dollar, whereby the shipment was made between June 19th and July 31st.

[1] It is stipulated that the oil was received for shipment in good order. The bills of lading contain the exception, "Leakage of contents at owner's risk." This, however, does not absolve the carrier from liability arising from negligence, or want of the exercise of due diligence, in properly stowing cargo. Sections 8029, 8030, U. S. Compiled Statutes 1918; The Manitoba (D. C.) 104 Fed. 145; The Jeanie, 236 Fed. 463, 149 C. C. A. 515; The San Guglielmo (D. C.) 241 Fed. 968; Doherr v. Houston (D. C.) 123 Fed. 334. Such was the rule prior to the Harter Act (Comp. St. §§ 8029–8035)—that the carrier could not shield himself from negligence or inattention by exception in the bill of lading. Transportation Co. v. Downer, 11 Wall. 129, 133, 20 L. Ed. 160. See, also, Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788.

[2] It is, however, admitted that the exception casts upon the libelants the burden of establishing negligence or want of diligence in stowage which conduces, as the proximate cause, to the injury complained of. This burden, we are impressed, has been met, notwithstanding the propensity of the oil in liquid state to deteriorate the containers.

We conclude, therefore, that the loss of the oil, except the normal amount incident to such shipments, is due to negligent stowage on the part of the ship.

Affirmed.

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

