GILCHRIST TRANSP. CO. v. BOSTON INS. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 8, 1915.)

No. 2637.

1. SHIPPING ⬩125—LIABILITY FOR DAMAGE TO CARGO—COMMENCEMENT OF VOYAGE.

A steamship, which after loading a cargo of grain from an elevator in April moved from her berth to a place in Duluth harbor seven miles distant, where she was made fast to another vessel and remained several days and until a storm occurred, during which her cargo was damaged, *held* not to have commenced her voyage, where she was obliged to leave her loading berth to permit another vessel to load at the elevator, and where she had not been inspected and was not ready to sail, and the lake was not sufficiently clear of ice to make her departure prudent, so as to make her liable for deviation from her proper course.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 459, 460, 466; Dec. Dig. ⬩125.]

2. SHIPPING ⬩138—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT.

Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (Comp. St. 1913, § 8031), which exempts a vessel and owner in certain circumstances from liability for loss or damage to cargo resulting from faults or errors in navigation or in the management of the vessel, does not apply until the vessel has commenced her voyage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬩138.

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

3. SHIPPING ⬩141—LIABILITY FOR DAMAGE TO CARGO—EXEMPTIONS IN BILLS OF LADING.

A bill of lading cannot exempt a vessel from liability for damage to cargo due to the negligence of the carrier or its servants.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497–499; Dec. Dig. ⬩141.]

4. SHIPPING ⬩124—LIABILITY FOR DAMAGE TO CARGO—NEGLIGENT MANAGEMENT OF VESSEL BEFORE COMMENCEMENT OF VOYAGE.

The steamship Schuck, after loading with grain and while waiting in Duluth harbor for navigation to open, was made fast to another loaded vessel of the same owner, starboard to starboard, the Schuck headed toward the northwest. Warning was given in the evening by the signal station of the coming of a storm from the northeast with a velocity of not less than 40 miles an hour. Both vessels were of steel, and were more than 400 feet in length. Neither had steam up, and no precautions were taken against the storm, which before morning caused their anchors to drag and drove them broadside across the harbor and against the shore, where the rubbing of the other vessel cut the rivets on the side of the Schuck which let in water and damaged her cargo. *Held*, that her master was negligent in not placing her under steam when warned of the storm and separating her from the other vessel, so that she could swing with the wind, and that she was liable for the cargo loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 458, 466; Dec. Dig. ⬩124.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty by the Boston Insurance Company and others

against the steamer R. E. Schuck, the Gilchrist Transportation Company claimant. Decree for libelants, and claimant appeals. Affirmed.

H. A. Kelley and A. J. Gilchrist, both of Cleveland, Ohio, for appellant.

F. H. Canfield, of Detroit, Mich., for appellees.

Before WARRINGTON and KNAPPEN, Circuit Judges, and EVANS, District Judge.

EVANS, District Judge. Certain insurance companies issued to various shippers of large quantities of wheat and barley on the steamer R. E. Schuck certificates of insurance at and from Duluth to Buffalo, the loss, if any, payable to the order of the assured. Each of the certificates was dated April 13, 1909, on which date, or within a few days thereafter, the grain was loaded on the Schuck at Itaska elevator at the port of Allouez, Wis. She was the property of the Gilchrist Transportation Company, and until on or about April 26, 1909, remained moored at the elevator pier. To enable the elevator to load a similar cargo upon the George W. Peavy, the Schuck was required to leave, and accordingly she went to anchorage in Duluth harbor at a point about seven miles distant.[1]

She there anchored alongside the P. G. Walker, another ship owned by the respondent company, which, though it had also been loaded with grain at the Itaska elevator, had not been fitted out for a voyage, and to her the Schuck was made fast. Some days afterwards, and while the two ships were thus situated, a damage and loss to the cargo of the Schuck occurred, which, when the amount of it was accurately ascertained, was paid by the insurance companies. Assignments of the certificates were taken by the insurers, who were thereby subrogated to the rights of the assured (Liverpool Steam Co. v. Phoenix Ins. Co., 129 U. S. 462, 9 Sup. Ct. 469, 32 L. Ed. 788), and they filed the libel which began this action to enforce against the ship claims for damages equal to the amount of insurance paid. They base the right to recover upon two grounds; the first being that after the Schuck left the port of Allouez, instead of proceeding on her proper course to Buffalo, she wrongfully deviated therefrom and went into the harbor of Duluth, and the second, that the damage to the cargo was the result of the fault, negligence, and want of care of the owners of the Schuck and the persons in charge of her, the details being stated as follows:

"(a) In anchoring said steamer in the harbor of Duluth in a dangerous and exposed situation and alongside of the said steamer Walker, and in making her fast to the said steamer, and in allowing the steam in the boilers of said steamer to run down, so that she was without power to protect herself.

"(b) In not keeping proper watch of the indications of the weather, so as to guard against danger of approaching storm.

"(c) In anchoring said steamer in a negligent and unseamanlike manner, and in making her fast alongside of said steamer Walker, and in not getting

---

[1] Note.—By a clause of the Rivers and Harbors Act of June 3, 1896, c. 314 (29 Stat. 212), provision was made for "improving the harbor at Duluth, Minnesota, and Superior, Wisconsin, at the west end of Lake Superior," the practical result of which was to make Duluth harbor basin the only harbor in that vicinity for the anchorage of vessels.

said steamers apart and away from each other, so that they would not be injured by rolling and pounding against each other, whereby the steamer R. E. Schuck was caused to leak and her cargo damaged, as aforesaid.

"(d) In allowing said steamer Schuck to go aground, and while aground to be pounded and injured by said steamer Walker."

The libelants also charge that when the Schuck left the port of Allouez she was not in a seaworthy condition, mainly because she was not properly and adequately manned, being at the time short a second mate and two or more seamen.

The Gilchrist Transportation Company, through receivers who had been put in charge of its property and affairs by the orders of the United States Circuit Court for the Northern District of Ohio, in due form made claim to the ship and filed an answer to the libel, in which, denying all charges of unseaworthiness and of fault, negligence, or want of care upon the part of the owner of the ship, or those in charge of her, it was alleged that the Schuck was entirely seaworthy when, with the consent of the owners of the cargo and for other reasons stated in the answer, she was moved from the Itaska elevator to a point opposite the Pittsburg Coal Company dock No. 1 in Duluth harbor basin and alongside the P. G. Walker, to which she was properly made, and afterwards continued to be, fast, all of which was claimed to be good management and skillful seamanship under the circumstances then existing.

The answer showed, further, that each shipper of part of the grain which made up the cargo of the Schuck for the voyage was given a bill of lading, one of which (all being substantially alike) will be hereafter set forth. The respondent also insisted that the voyage from Duluth to Buffalo had begun when the Schuck left the port of Allouez, and in any event claimed the benefits of the provisions of the third section of the Harter Act.

[1] 1. It seems to us from the testimony, and we find the fact to be, that when the Schuck moved from the Itaska elevator in Allouez Bay, she did not do so for the purpose nor with the intention of then commencing her voyage to Buffalo. Her purpose was altogether different. She changed her location for several reasons disclosed by the testimony, the first of which was that another ship was to be loaded at the Itaska elevator, and she moved away to afford an opportunity for that to be done. Besides, she was not ready to sail, and had not been inspected by the United States authorities, though at the time under notice to prepare for that requirement, and, furthermore, it appears quite certain that navigation had not opened, and that the exits from Duluth harbor to the open lake were not at the time so clear and free of ice as to make her departure prudent. Upon these facts we hold that her voyage had not commenced, and consequently that there was no deviation from her proper course.

[2] 2. When the loss occurred, the Schuck, as we have found, had not commenced her voyage. True, two weeks before she was loaded; but she was not ready to sail, because she had not received the inspection for which she had applied, and because navigation had not opened in the Great Lakes. For these reasons she remained at anchor in the harbor from which her voyage was to begin. In these circumstances is

section 3 of the Harter Act [2] (which is set forth in the margin) available for the relief of the respondent? This question was answered in the negative by the Circuit Court of Appeals of the Second Circuit in Ralli v. New York, etc., Co., 154 Fed. 287, 83 C. C. A. 290, where Judge Lacombe, speaking for the court, said:

"We are of the opinion that respondent cannot claim the benefit of the section above quoted [section 3 of the Harter Act], for the reason that the voyage had not commenced, the cargo was not yet all on board, nor the vessel ready to sail. We find no authority either way on this proposition. The citations on the appellee's brief deal with different questions; but the language of the section so clearly contemplates a distinction between the preparation for a voyage, and the management of the same after it is begun, that, in the absence of adverse authority, we feel no hesitation in adopting this construction."

And Judge Gilbert, in delivering the opinion of the Circuit Court of Appeals of the Ninth Circuit in Steamship Wellesley Co. v. C. A. Hooper Co., 185 Fed. at page 738, 108 C. C. A. 71, referring to Ralli v. New York, etc., Co., said:

"In that case the court held that the language of section 3 of the Harter Act clearly contemplates a distinction between the preparation for a voyage and the management of the same after it is begun, and that the voyage does not commence until the cargo is on board and the vessel ready to sail. The doctrine of that decision is not discredited, but is to some extent supported by the language of the opinion in The Germanic, 196 U. S. 589 [25 Sup. Ct. 317, 49 L. Ed. 610]."

The court below had taken that view, and accordingly its judgment was affirmed. The essential proposition upon which the two cases last cited were decided was that the ship's voyage had not, in fact, commenced when the loss occurred, and for that reason section 3 of the Harter Act did not apply. That, in our view, was the proper construction, and it cannot be important whether one obstacle or another caused the ship to remain in the port of departure. The Schuck had been loaded for a fortnight, but could not commence her voyage until inspected and until navigation opened. Awaiting these events, she remained at anchor in Duluth harbor lashed to an inert sister ship, and therefore her case does not come within the provisions of the section.

3. The Schuck and the Perry G. Walker, both owned by the respondent, were laid up at Itaska elevator during the winter of 1908–09, where they were given a free dock because the operators of the elevator wanted ships available when they should get ready to charter in the

---

[2] NOTE.—Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service.

spring. A "vessel agent" on March 18, 1909, by telegraph, arranged a charter—or probably more properly a contract of affreightment—for both ships for cargoes of grain to be carried, either to Chicago, Georgian Bay, or Buffalo at shipper's option. The Walker had loaded first. The charter required that the vessels should sail within ten days after the opening of navigation, and meanwhile, but at different times, they moved to Duluth harbor, the only place of anchorage in the vicinity of Duluth and Superior. The cargo of the Schuck was made up of seven separate lots of grain owned by as many different persons. To each the carrier gave a separate bill of lading, and, excepting as to name of shipper and quantity of grain, the bills of lading were precisely alike. One of them, omitting parts not now essential, was as follows:

"No......                              Duluth, Minn., April 13, 1909.

"Shipped in good order and condition by Ames Brooks Co., as agents and forwarders for account and risk of whom it may concern, on board the Str. R. E. Schuck now in the port of Duluth and bound for Buffalo, N. Y., the following articles as here marked and described, to be delivered in like good order and condition, as addressed on the margin, or to his or their assigns or assignees, upon paying the freight and charges as noted below. All deficiency in cargo to be paid for by the carrier and deducted from the freight, and any excess in cargo to be paid for to the carrier by the consignee. In case grain becomes heated while in transit, the carrier shall deliver his entire cargo and pay only for all deficiency exceeding five bushels for each 1,000 bushels. (The dangers of navigation, fire, and collision excepted.)"

Upon this state of case, whether the Schuck was a common carrier within the definition of the Supreme Court in Liverpool Steam Co. v. Phœnix Insurance Co., 129 U. S. 437, 9 Sup. Ct. 469, 32 L. Ed. 788, and in Story on Bailments, § 495, is a question which we need not decide, especially as the testimony as to the previous history of the ship and her usual course of business is neither definite nor satisfactory. But she at least was an ordinary bailee for hire and subject to the general rules of law governing that relation.

[3] Speaking generally, the bills of lading evidenced the contracts between the Schuck and the shippers, to whose rights the libelants succeeded. The bills of lading certainly provided against liability for losses from dangers of navigation, fire, and collision; but they did not, and could not consistently, either with section 1 of the Harter Act or with public policy or general principles of maritime law, stipulate for exemption from liability for losses resulting from the negligence of the owner or its servants. In Liverpool Steam Co. v. Phœnix Ins. Co., 129 U. S. at page 438, 9 Sup. Ct. 469, at page 471, 32 L. Ed. 788, Mr. Justice Gray, delivering the opinion of the court, said:

"But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held, an exception, in the bill of lading, of perils of the sea, or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed."

Several cases were cited by the court, and many others might be noted here, if necessary, to show the general rule which embraces all carriers.

[4] It remains to be determined whether the fault, negligence, or want of care of those in charge of the Schuck at the time of the injuries complained of contributed to the damages then done to the cargo. Undoubtedly the storm which then prevailed was one of the factors of trouble, as well as one of the perils of navigation sought to be provided against in the bills of lading; but that provision, under principles of public policy, was subject to the exception or condition respecting the negligence of the carrier to which the opinion of the Supreme Court last cited referred. Notwithstanding the clause in the bill of lading, the ship and those in charge of her are bound to use at least ordinary and reasonable care and diligence, such as prudent men would exert, to prevent damage to a cargo even in case of storm.

The Schuck was a steel vessel 416 feet long, 50 feet beam, 28 feet in depth, and of 4,713 gross tons. The P. G. Walker was approximately of the same dimensions and also of steel construction. Both vessels were owned by the respondent. In considering the question of negligence, these facts are important. The trial court found that when, on April 26, 1909, the Schuck reached her last location in Duluth harbor, she found the Walker there and made fast to her, that the two steamers were lashed together starboard and starboard, with two anchors out from the bows of each, the Schuck heading towards the northwest and the Walker towards the southeast; that the Walker was not yet fitted out, had no steam, and only an engineer's crew and a man and wife to cook; that the Schuck had some steam on when she made fast to the Walker, but that about noon of April 28th her master ordered the engineer to let it go down in order to have the boilers cool for inspection on the next day; that the fires were banked accordingly; that during the afternoon of the 28th indications of an approaching storm were present; that about 10 o'clock in the evening of that day the weather office in Duluth displayed signals warning that a storm was coming from the northeast with a velocity of not less than 40 miles an hour; that the Schuck had ample notice of this situation; that at this time both steamers lay lashed together without steam; that the captain of the Walker had gone on board the Schuck, and all hands had turned in excepting the two captains; that no preparations for the storm were made; that about 2 o'clock in the morning of the 29th the wind was blowing heavily from the northeast at a rate stated by the master of the Schuck to be 50 miles an hour, and the steamers lay together broadside to this storm; that about 2:30 o'clock the steamers began to drag their anchors, and except for a short interval, while the anchors held, continued to drift to the same position until about 5 o'clock in the morning, when they had crossed the harbor, a distance of about a mile, and brought up against the southeast bank; that the Schuck then lay against the bank, with the Walker rolling against her on the outside; that by this time a heavy sea was running, and the Walker, still lashed to the Schuck, rubbed against her side, cutting the rivets in her plates and breaking her walestrake, so that water entered into her hold and wet the grain; that on the morning of the 30th the Schuck backed off, and the Walker was towed away by a tug; that the Schuck did not use the requisite care, nor that prudence which required that she should

have been placed under steam as soon as the signal of the approaching northeast gale was given, and that the two steamers should have been separated, in order that they might swing with the wind when it changed from northwest to northeast; that when it was discovered that the two steamers so lashed together were drifting, and their anchors failing to hold, good seamanship and prudence required that they should be separated, so that the Schuck could swing with the wind, have a better chance for her anchors to hold, and ampler opportunity to use her own steam for the protection of her cargo and herself, and in case she should go on the bank that she would not be pounded by the Walker, and by rolling against her cause further damage; that ordinary care and seamanship required a timely separation of the vessels, and that the failure to do so was negligence; that it was also negligence on the part of the Schuck to omit these precautions, and to permit the two steamers to drift broadside to the storm entirely across the harbor and upon the bank, and then permit them to lie there together, pounding one another, until the wind subsided; that it was the Schuck's duty to use due care and prudence for the safety of the cargo, as well as the ship; that the conduct of the master of the Schuck was influenced and is explained by the fact that the master of the Walker was also on board the Schuck; that a lack of proper and timely precaution at the outset, coupled with fear for the Walker at a later period, explained the unfortunate results; that the Schuck did not exercise that degree of care, caution, prudence, and good seamanship as an individual ship, without reference to the necessities of the Walker, which the law requires of a ship loaded with grain while at anchor preparing to commence her voyage; and, generally, that the Schuck was guilty of negligence as charged in the libel.

A very careful consideration of the testimony has led us to the conclusion that the Schuck and those in charge of her were negligent and in fault in the respects found by the trial court, and that that fault and negligence contributed to and in large measure caused the damage and injury complained of in the libel.

The final decree awarded the libelants $15,578.46 in damages, with interest thereon from the date of filing the libel to the date of the decree, and objection is made both to the amount of damages and the allowing of interest thereon. We think the testimony justifies the finding of the court in this respect also. While the second assignment of error complains of the allowance of interest, the objection was not argued either at the hearing or in the brief, and under our settled practice it was waived.

We find no substantial error in the record, and the decree is affirmed, with costs.