## THE ISLA DE PANAY (three cases). *

(Circuit Court of Appeals, Second Circuit. July 17, 1923.)

Nos. 248–250.

1. **Shipping ⬳141(1)—Bill of lading held not to relieve ship from liability for negligence.**

   Provision in bill of lading that carrier was not responsible for contents, weight, and quality of packages, nor breakage and fragile containers, did not relieve the ship from liability for damage resulting from negligence in stowage or in handling or care of merchandise.

2. **Shipping ⬳132(5)—Evidence held to show proper stowage and care.**

   In libels for damages to olives delivered in bad order, evidence *held* to show that stowage was proper, and that the handling of the cargo was free from negligence.

3. **Shipping ⬳106—Ship held not liable to innocent holders of bills of lading.**

   A ship *held* not liable to innocent holders of clean bills of lading, issued in consideration of guaranty of shippers to hold owner harmless should any damage occur, in that a fraud had been committed on the holder; defense being that containers were insufficient.

4. **Shipping ⬳140—No liability for loss from excepted peril, unless negligence shown.**

   The general rule is that, where a loss arises from an excepted peril, the ship is prima facie excused, and can only be held liable on affirmative proof that some negligence on the ship's part was the efficient cause of the loss.

5. **Evidence ⬳407(2)—Bill of lading as receipt may be contradicted by parol.**

   A bill of lading, when considered as a receipt for goods, may be contradicted by parol evidence.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 44 Sup. Ct. 133, 68 L. Ed. —.

**6. Shipping ⟲106—"Clean bill of lading" defined.**

A "clean-bill of lading" is one which contains nothing in the margin qualifying the words in the bill of lading itself.

[Ed. Note.—For other definitions, see Words and Phrases, Clean Bill of Lading.]

**7. Shipping ⟲120—Ship liable for damaged condition of cargo only for its fault.**

Under Act Aug. 29, 1916, § 2 (Comp. St. § 8604aaaa), if a consignee in a straight bill· of lading pays consignor for the goods before he receives them, or directs his banker to pay on presentation of a clean bill of lading, he pays at his own risk, and cannot hold the ship liable, unless he can show that the damaged condition of the merchandise was occasioned by the ship's default.

**8. Shipping ⟲140—Letters of guaranty held not to impose liability on ship.**

Where letters of guaranty were not addressed to a ship, or its captain or master, but to the company owning the ship, they could impose no liability on the ship by reason of the issue of clean bills of lading; neither the captain nor any other officer of the ship having anything to do with such letters or even seeing them.

**9. Estoppel ⟲95—Character of silence operating as an estoppel stated.**

When silence is of such a character and under such circumstances that it would become a fraud on the other party to permit the party who has kept silent to deny that his silence has induced the other to believe and act on it, the silence will operate as an estoppel.

**10. Shipping ⟲136—Ship held not estopped from showing true condition of shipment when received.**

Under Harter Act, § 4 (Comp. St. § 8032), a ship was not estopped from showing the true condition of shipment when received on board in a proceeding by innocent holder of clean bill of lading for damages for delivery in bad condition; the bill of lading being silent as to the true condition of the shipment, and the owners of the ship having received letters of guarantee.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by Austin Nichols & Co., by Eug. Sanchez and Jose Gilde Sagredo, as copartners, etc., and by E. Tolibia & Co., respectively, against the steamship Isla de Panay. From adverse decrees, the libelants appeal. Affirmed.

Bigham, Englar & Jones, of New York City (T. Catesby Jones, of New York City, of counsel), for appellants.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for appellee.

Before ROGERS. HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. These are three libels filed against the steamship Isla de Panay. Austin Nichols & Co., the libelant in the first case, is a corporation organized under the laws of the state of New York, and has an office and place of business in the borough of Manhattan, city of New York. In its libel it alleges that on October 27, 1917, one Pyman shipped and placed on board the steamship at the port of Cadiz, Spain, 227 packages of olives in good order and condition, to be carried by the steamship as a common carrier from the port of Cadiz to the port of New York, there to be delivered in like good order and condition as when shipped to the libelant. It alleges that

⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the ship arrived in New York in November, 1917, and discharged her cargo, but not in like good order and condition as when shipped, but badly damaged. The libelant claims that by reason of the premises it has sustained damages in about the sum of $11,000. It therefore asks the court to decree to libelant its damages, with interest and costs, and that the steamship be condemned and sold to satisfy the same.

Sanchez & Co., the libelant in the second case, is a copartnership doing business in the borough of Manhattan, in the city of New York. In its libel it alleges that on October 27, 1917, one De Ferry shipped and placed on board the steamship at the port of Cadiz, Spain, 100 packages of olives, likewise in good order and condition, to be carried by the steamship as a common carrier from the port in Spain to the port of New York, and there delivered to the libelant in like good order and condition as when shipped. It alleges that delivery was made in November, 1917, but not in like good order and condition as when shipped, but badly damaged. The libelant alleges it has sustained damages in the sum of about $1,800, for which a decree is asked as in the first action.

E. Tolibia & Co., the libelant in the third case, is a corporation organized under the laws of the state of New York. It has its office and place of business in the city of New York. It alleges that on October 27, 1917, there were shipped on board the steamship in the port of Cadiz 27 packages of olives in good order and condition, to be carried as a common carrier from the port in Spain to the port of New York, and there delivered to the libelant in like good condition as when shipped. It alleges delivery in damaged condition, and asks damages in the sum of $500, and a decree against the ship as in the other two actions was prayed.

The court below dismissed the libels, with costs, having found that the great weight of evidence showed that the chestnut casks containing the olives were old and insufficient at the time of shipment. The court also found that there was no evidence of bad stowage, of unusual weather, or of an unseaworthy vessel. The three cases were tried on the same proof in the court below, and after decree the proctors stipulated that the causes be consolidated on appeal to this court and be heard on one record, and an order to that effect was duly entered.

The bills of lading issued for the casks of olives were issued at Seville by the captain of the Mogador. They were not signed at any time by the captain of the Isla de Panay. The latter only signed for the freight that was delivered direct at Cadiz. The casks of olives were delivered to the line direct at Seville and brought, from there on the Mogador down to Cadiz on the river Guadalquivir, a distance of about 70 or 80 miles. At that point the casks were unloaded from the Mogador to the Panay. The bills of lading issued when the casks were put on the Mogador at Seville were never presented to the captain of the Panay, who testified that "the bills of lading from Seville were never presented to me." He was examined as to the usual method of procedure at Seville—it appearing that he at one time had been captain of the Mogador, running between Seville and Cadiz. He stated that the captain in command at Seville was not under obligations to

put notations on the bills of lading as to the condition of the goods, where letters of guaranty were given relieving the ship of responsibility. In the present suit no letters of guaranty were given to the captain of the Panay at Cadiz. They had been given to the captain of the Mogador at Seville, when the casks were placed on that vessel. The explanation given of the letters of guaranty was as follows:

"If the bills of lading are issued with a note on them the insurance companies or the bankers in Spain will not accept that bill of lading on account of the condition in which the goods are; but, if they have no cause on it, they will pass it to a banking house and the insurance company that they have been shipped by the shipper in apparent good order and condition, although they have issued a letter of guaranty relieving the company of any responsibility whatsoever for the condition of the packages."

The letters of guaranty were three, one for each shipper in these suits, signed by the shippers or some one representing them. They are referred to more fully in another part of this opinion. The captain of the Panay never saw the guaranties until he saw them in New York. He never had the bills of lading, and never had the guaranties in his possession at Cadiz. The captain of the Panay was asked whether he made any notation of the condition of the casks on the bills of lading when the olives were received on his vessel at Cadiz, and he said he did not, "because they were through ladings from Seville," but that he made notations of their condition on the shipping orders.

The Panay arrived at Cadiz on November 4th at 2 o'clock in the afternoon, and sailed at 5 o'clock in the afternoon of the next day. While at Cadiz, the ship took on board 354 casks of olives consigned to the libelants. These casks had been brought from Seville on the Mogador, a boat which belonged to the same line to which the claimant belongs. The Mogador left Seville on the morning of the day she arrived at Cadiz; the trip · occupying about eight hours. The captain of the steamship testified that he observed the casks as they were lying on the lighters, and that he saw "they were very old, that the hoops were old and rusty, that the heads were warped," and the casks "were in very bad condition." The hoops he said "were rusty, would break off; if you just touched them, they would fall off." The heads of the casks were "warped and deformed, and, as the hoop broke off, the weight of the cask being so great, heads would pop out." Asked as to whether they were proper containers for olives, he said: "They were very bad." He thought the casks might have been 20 years old, and he had never seen casks as old as those here involved, and had never seen hoops as rusty. He had never seen hoops "in such an extraordinary state." When asked as to their condition when they reached New York and were put on the dock, he said:

"Saw some of the casks; you touch them only, and the hoops would come off, and the head would come out, and the olives would come all over the dock. They were shoveled back into the casks and set on their heads; put the hoops around them, salt and water; put the head back in order to try to preserve the olives. Out of every two that were unloaded, one would come apart."

And the chief officer of the ship, who had charge of the stowage of the cargo, testified as follows:

"Q. When did you first see the bills of lading in this case? A. Here.

"Q. Did not the ship have a copy of them? A. These are the first ones that I saw. The copies that the ship has are from Cadiz.

"Q. Where did you get them? A. They did not give me any.

"Q. What is your usual custom? Do you not have a set of bills of lading handed to you on board the ship when the cargo is turned over to you? A. In Cadiz they use a shipping order. * * *

"Q. And when the cargo comes on, and these different consignments arrive on board, do you not receive copies of the bills of lading to check up the packages, and so on? A. In other ports they do, but not at Cadiz."

His testimony fully corroborated that given by the captain as to the condition of the casks when they were loaded on the steamship at Cadiz. An excerpt from his testimony follows:

"Q. When you saw this cargo going on board the Isla de Panay at Cadiz, were all these casks in bad condition? A. Nearly all.

"Q. That is, taking the entire shipment of 300 and some odd casks, they were practically all in bad condition from what you saw; is that correct? A. Yes; the majority.

"Q. How many casks would you say were in bad condition? A. 300 of them, some odd.

"Q. Assuming that there were 354 altogether, how many out of the 354 would you say were in bad condition as you have described here? A. Nearly all.

"Q. 354, or 325, or what? A. About 325."

The casks were made of chestnut wood, instead of oak. The testimony shows that such casks are much inferior to those made of oak. The chestnut casks are invariably accompanied with heavy leakage of the brine, and the brine causes the chestnut wood, which is softer than oak and more brittle, to become soggy. When it gets soggy and saturated, the staves crack, the hoops rust, the staves open, and the brine runs out. The casks were carefully stowed on the steamship, none of them being stowed more than two tiers high. They arrived at New York in the same position as when they were stowed at Cadiz. They had not moved. The inspectors of cargoes and cargo surveyors testified that the stowage was customary and proper. One of them said: "It is excellent stowage. It is rather better than is usual." They were also asked as to the taking of the casks out of the vessel when she arrived at New York, and whether they had any fault to find with it, and said: "None whatever." Another said the stowage was perfectly justified.

[1, 2] In the instant cases the bills of lading, in paragraph 7, state:

"The company is * * * not responsible for the contents, weight, and quality of the packages; * * * nor for breakage and fragile containers. * * *"

In the present cases the shippers in effect contracted that they would stand the loss arising from the breakage, and, as we think, of the insufficiency of the containers. This cannot relieve the ship from liability for damage resulting from negligence in stowage, or in handling or care of merchandise committed to its charge. Gilchrist Transportation Co. v. Boston Insurance Co., 223 Fed. 716, 139 C. C. A. 246. But

we are in full accord with the court below that in the instant cases the stowage was proper and that the handling of the cargo was free from negligence.

[3] It appears that the vessel met with no unusual weather during the voyage. The highest wind force recorded was seven on the Beaufort scale. The chief officer of the ship testified that the ship encountered the usual November weather; "moderate weather; not very bad." No evidence of negligent stowage was offered. The libelants rested chiefly upon their contention that, as it must have been apparent that the containers were insufficient at the point of shipment, a notation to that effect should have been made upon the bills of lading; and that issuing clean bills of lading in consideration of the guaranty of the shippers to hold the claimant harmless, should any damage occur to the goods while on the voyage, a fraud had been committed upon the libelants, alleged to be innocent holders of the bills of lading, and the claimant was therefore estopped from raising the defense of insufficient containers.

It is to be kept in mind throughout this opinion that these suits are not in personam against the owners of the vessel, but they are in rem against the ship. If a libelant has a claim against the owners of a ship personally as well as against the ship, he may ordinarily enforce it by uniting the two and bring his libel in personam and in rem; but that has not been done in the pending suits. The libels allege that there was placed on board the steamship at Cadiz "in good order and condition" certain merchandise, to be delivered to the libelants at the port of New York "in like good order and condition as when shipped." They allege that, when the goods were discharged in New York, they were not in like good order and condition as when shipped, but badly damaged.

Now, it is evident, from what has been already stated, that this court is abundantly satisfied that the goods, when they were put on board the Panay, were not in good order and condition, but were in very bad order and condition, because they were packed in insufficient containers. It is also clear that, when the merchandise arrived in New York, it was badly damaged, but that the damage was not due to faulty stowage or negligent handling by the ship. It also appears that the bills of lading were not signed by any officer of the Panay, but bore the signature of the captain of the Mogador, and that the merchandise, at the time it was placed on the Mogador, was in casks which were seen to be so old, weak, and defective that those in charge at Seville objected to accepting them, and the shippers thereupon offered letters of guaranty to take the place of any notations on the bills of lading, a practice which appears to be quite common in Spain.

Under these circumstances, we do not see how the libel can be maintained against the Panay. If, for the sake of the argument, it be assumed that the bills of lading signed by the captain of the Mogador were binding upon the Panay, although its officers never signed or saw them, the latter vessel could not be condemned, in our opinion, on the facts as they are disclosed in the record.

[4] The general rule is that, where a loss arises from an excepted peril, the ship is prima facie excused, and can only be held liable upon

affirmative proof that some negligence on the ship's part was the efficient cause of the loss. Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985. In such cases the ship is discharged, unless convicted of negligence by a preponderance of proof. As was said in The Lennox (D. C.) 90 Fed. 308, if the cause of the injury is left in doubt, the ship stands excused, for the reason that by virtue of the exceptions in the bill of lading the shipper in effect contracts that he will himself stand the risk of any loss arising from the cause named.

In The Konigin Luise (D. C.) 173 Fed. 811, suit was brought to recover for the leaked out portion of a consignment of 200 barrels of olive oil shipped from Smyrna to New York. The bill of lading, unlike those in the instant cases, contained an acknowledgment of receipt of the goods in good order and condition externally. The carrier interposed the defense of the insufficiency of the package. The libelant also raised the question of estoppel, claiming to be a purchaser for value of a clean bill of lading. The evidence showed that a large number of the barrels were found empty at New York, many of them having broken heads and loosened and missing hoops. The District Judge entered a decree in favor of libelant. The case was brought on appeal into this court, where it was reversed. There was no proof of bad stowage or mishandling. This court held the carrier exempt, because the loss was due to breakage. 185 Fed. 478, 107 C. C. A. 578. In that case this court applied the rule laid down in The Lennox, supra, that where a loss arises from one of the excepted perils she can only be held liable upon affirmative proof that some negligence on her part was the efficient cause of the loss. We held the ship was prima facie not liable, and that proof of the ship's negligence was insufficient to preclude it from relying on the exception.

In The Koranna (D. C.) 214 Fed. 172, the libelants sued for damage to a consignment of cocoanut oil pipes which were brought to the port of New York from Colombo, Ceylon. On the arrival in New York, 13 of the casks were nearly empty, 18 were in bad condition, and the rest contained only about one-half of their original contents. The libel was dismissed, as the court did not think that it had been proven by a fair preponderance of the evidence that the damage was occasioned by the negligence of the vessel. The bill of lading provided that the carrier should not be liable for drainage, leakage, breakage, contact with other goods, or for insufficient packing. The court declared that, whenever damages attributable to causes excepted in the bill of lading are sustained, the burden is on the libelant to show that the loss occurred through the negligence of the carrying vessel.

In E. Tolibia & Co., Inc., v. S. S. Orion, 290 Fed. 379, decided at this term, the shipment consisted of barrels of olives and olive oil. The bills of lading, like these in the instant cases, acknowledged receipt of the packages without any reference to their order and condition one way or the other. The voyage began at Seville, Spain, and ended at the city of New York. The oil leaked so badly from these barrels after they were placed on board the vessel that the ship was obliged to pump large quantities of oil from the bilges before leaving port. It was claimed that improper stowage brought about the damage. The court

below held that the barrels were insufficient containers and dismissed the libels. This court affirmed the court below, and held that the libelant had failed to meet the burden assumed by it to prove that there was improper stowage, which caused the loss.

In the instant cases the damage to the merchandise came within the exemptions of the bill of lading, which declared that the shipowners were not responsible for breakage. That many of the casks were broken is undisputed. The burden of proof rested upon the libelants to establish negligence on the part of the claimant, and this burden we have no hesitation in saying was not sustained. On the contrary, it has been established by the overwhelming weight of evidence that whatever damage the merchandise suffered in the cases now before the court was due, not to the negligence of the ship, but to the old and insufficient containers in which the goods were shipped. In 2 Williston on Contracts, 2025, it is said:

"A bill of lading is always a receipt; * * * like other receipts, it is only prima facie evidence of the acknowledgments contained in it, unless the parties by its express terms make it conclusive, as they may do. * * * It is also a contract, or evidence of a contract."

In what respects it is a contract it is not now necessary for us to consider. Lord Bramwell, a judge of very high authority, said in Sewall v. Burdick, 10 A. C. 74, 105, that to his mind "there is no contract in it." But assuming, as we do, that in this he was mistaken, we nevertheless are not in these cases concerned with the contractual parts of the bills of lading.

[5] The primary purpose of a bill of lading is to express the terms of the contract between the shipper and the carrier as to the transportation and delivery of the goods. But it has a twofold character, and it is also an acknowledgment of receipt of the goods shipped. As a receipt it may be contradicted by parol evidence. In The Delaware, 14 Wall. 579, 601 (20 L. Ed. 779) the court, speaking through Mr. Justice Clifford, said:

"Text-writers mention the bill of lading as an example of an instrument which partakes of a twofold character, and such commentators agree that the instrument may, as between the carrier and the shipper, be contradicted and explained in its recital that the goods were in good order and well conditioned, by showing that their internal state and condition was bad, or not such as is represented in the instrument, and in like manner in respect to any other fact which it erroneously recites, but in all other respects it is to be treated like other written contracts."

In 4 Am. & Eng. Encyc. of Law, 526, it is said:

"The general rule is that a bill of lading, in so far as it admits the receipt of goods by the carrier and states the character, quality, quantity, or condition of the goods when they were received, is a mere receipt, and may be explained and contradicted by parol evidence."

But in the instant cases the bills of lading do not need to be contradicted, as they are silent as to the condition of the merchandise when it was received.

[6] The bills of lading which were issued in these cases were what are known as "clean" bills. A clean bill of lading is one which contains

nothing in the margin qualifying the words in the bill of lading itself. 61 Law Times, 330; 1 Bouvier's Law Dictionary, p. 358. A witness at the trial was asked what was meant by a clean bill of lading, and he replied:

"A clean bill of lading is a bill of lading that a banker will accept and attach to a draft, and on which he will make payment against a letter of credit, and which indicates that the merchandise was in good condition when it was received from the steamship company."

The libelants paid for the olives on the strength of the bills of lading. One of the libelants in the first action testified as follows:

"Q. On the strength of this bill of lading, did you accept the shipment? A. Yes.

"Q. Did you pay the shipper for the goods? A. The money was placed in Seville at the time we made our purchase, and it was made available for his drafts in connection with a clean bill of lading.

"Q. You paid the money in advance, on which he could draw for a clean bill of lading? A. Yes; in other words, a letter of credit was opened.

"Q. Under your arrangement, would he have been able to draw on a bill of lading which was not clean? A. He would not."

And one of the libelants in the second action, after stating that he was presented with a clean bill of lading and thereupon accepted the draft in payment, was asked:

"Have you in the course of your business ever accepted any bill of lading for consignments of olives containing notations as to insufficient containers?"

And he answered, "No."

[7] The bills of lading in the instant cases were straight bills of lading. The Act of August 29, 1916, known as the Bills of Lading Act, declares:

That "a bill in which it is stated that the goods are consigned or destined to a specified person is a straight bill." 39 Stat. p. 539, § 2 (Comp. St. § 8604aaaa).

And the act makes straight bills nonnegotiable, and order bills negotiable. Section 29 of the act (Comp. St. § 8604o) provides that a straight bill cannot be negotiated free from existing equities. Where the shipper names another as consignee the title is in the person so named. George F. Hinrichs, Inc., v. Standard Trust & Savings Bank (C. C. A.) 279 Fed. 382, 386. If the consignee in a straight bill pays the consignor for the goods before he receives them, or directs his banker to pay for him on the presentation of a clean bill of lading, he pays at his own risk. If the goods reach him in damaged condition, he cannot hold the ship liable, unless he can show that the damaged condition of the merchandise was occasioned by the ship's default. In the instant cases no such default on the part of the ship is shown.

The master of the Panay, testifying as to what he would have done at Seville if the bill of lading had been presented to him as captain of the Mogador, said that if the goods were delivered to him in bad condition he might reject them, or accept them making his notation on the bill of lading concerning their condition, but that he would not make

such notations where he was given letters of guaranty responding for his or the ship's responsibility for the freight. His testimony was:

"If a letter of guaranty is given me, relieving me or the ship of all responsibility, as was done in this case, no notation will be put on the bill of lading; but, if there is no letter of guaranty given, then a notation will be put on the bill of lading."

He was asked why letters of guaranty were given in Seville, and replied:

"If the bills of lading are issued with a note on them, the insurance companies or the bankers in Spain will not accept that bill of lading on account of the condition in which the goods are; but, if they have no clause on it, they will pass it to a banking house and the insurance company that they have been shipped by the shipper in apparent good order and condition, although they have issued a letter of guaranty relieving the company of any responsibility whatsoever for the condition of the packages."

He was then shown three letters, and asked what they were, and replied:

"They are letters of guaranty, relieving the company of all responsibility for the conditions in which the packages are received at destination."

These letters appear to be signed by the shippers in each of these actions. That in the first of the three suits is alone incorporated herein. It reads as follows:

"With reference to the shipment of 227 casks of olives that we are making by the steamer Isla de Panay to New York, we understand that the company considers the containers insufficient, and that it does not accept responsibility for the damages that they suffer as natural consequences of the voyage. And as guarantee of that company, we sign the present, as you have delivered us clean bills of lading."

The notations are not made on the bills of lading, because the shippers are opposed to the practice and prefer to give a guaranty. This opposition of the shippers to having notations made on the bills of lading is due to their belief that it unnecessarily prejudices their goods and "leaves everything to the good faith of the receivers."

[8] These letters of guaranty were not addressed to the Panay, or to its captain or master, but to the Compania Transatlantica, Seville, and were dated November 5, 1917, which was the day on which the Panay sailed from Cadiz. As neither the captain nor any other officer of the Panay ever had anything to do with these letters, or even saw them until they saw them in New York at or about the time of the trial, we confess inability to see how the letters impose upon the ship a liability which otherwise does not exist. So far as they could have any effect, they were intended to protect from liability, not to impose it.

[9, 10] It is said that the ship is estopped from showing the facts as to the condition of the shipment when it was received. The Harter Act (Act Feb. 13, 1893, c. 105, § 4 [Comp. St. § 8032]) makes it the duty of the shipowner, master, or agent of the vessel to issue to shippers of merchandise a bill of lading stating, among other things, the apparent order or condition of the merchandise received for transportation. That this section applies to a foreign vessel on a voyage from

a foreign port to a port in the United States was decided in Knott v. Botamy Mills, 179 U. S. 69, 74, 21 Sup. Ct. 30, 45 L. Ed. 90. It was urged upon us at the argument that the Harter Act made it the duty of the shipowner or the master to speak by the bill of lading as to the condition of the goods, and that the failure to speak operates as an estoppel. It is quite true that an estoppel may arise from silence, as well as from words, and that silence under some circumstances may amount to a misrepresentation. When the silence is of such a character and under such circumstances that it would become a fraud upon the other party to permit the party who has kept silent to deny that his silence has induced the other to believe and act upon it, the silence will operate as an estoppel. If a man is silent when it is his duty to speak, he shall not be permitted to speak when it is his duty to be silent. Niven v. Belknap, 2 Johns. (N. Y.) 575. But if, prior to the Harter Act, a bill of lading made no representation as to the condition of the goods, the silence of the bill worked no estoppel on the shipowner to deny that the goods were in proper containers. And since the Harter Act, if the bill of lading contains no representation on the subject, the omission may subject one to the penalty imposed by the act which declares that for a violation of any of its provisions the agent, owner, or master of the vessel guilty of such violation, "and who refuses to issue on demand the bill of lading herein provided for, shall be liable to a fine not exceeding $2,000." That is the only penalty the act prescribes. Whether the shipowner would have been estopped, if the master of the Panay had signed the bills of lading, is a question not before us, because we have seen that the goods shipped were delivered in the first instance to the Mogador at Seville, that the bills of lading were issued there, and not at Cadiz, and that the master of the Panay never saw or had anything whatever to do with them. The only papers he received were the shipping orders, and on them the notations were entered stating the condition of the cargo of olives when he received them. On this state of facts the Panay is not estopped from showing the true condition of the shipment when received on board at Cadiz.

The libelants also rely upon the case of Higgins v. Anglo-Algerian S. S. Co., 248 Fed. 386, 160 C. C. A. 396, which this court decided in 1918. In that case the steamer received 3,000 cases of dates at Busreh, to be carried to New York. A clean bill of lading was issued for the same, which recited that the dates were apparently in good order and condition. On their arrival in New York 2,085 of the cases were found to be damaged by water. In that case this court said:

"Further, the respondent had the courage to set up as a defense its own complicity in a fraud, viz. that a large number of the cases, which had been wet and were stained and discolored by rain, were received from lighters; that their stained, damaged, and discolored condition had been noted on the mate's receipts, but that a clean bill of lading was delivered to the shippers at their request against their agreement to indemnify the respondent against loss for so doing. This was pleaded as an admission, binding on the holder of the bill of lading, that the cases were not shipped in apparent good order and condition, and a bar to the maintenance of the libel. * * * Though courts of admiralty are not courts of equity, and may not be able to give affirmative relief in the case of contracts induced by preliminary fraudulent representations (Williams v. Insurance Co. (D. C.) 56 Fed. 159), still they do

proceed upon equitable principles, and may prevent a party from taking advantage of his own fraud in the contract itself. Pew v. Laughlin (D. C.) 3 Fed. 39, The Hero (D. C.) 6 Fed. 526, and The Electron (D. C.) 48 Fed. 689, are examples. To give the carrier the benefit of this exception would be to enable it to protect itself against the consequences of its own fraud."

In the Higgins Case the bills of lading recited 'that the shipments had been received in good condition. In the instant cases the bills of lading contain no representation as to their condition one way or the other, and the distinction is vital.

Decrees affirmed.