11 F.2d 49 (1926)
THE THOMAS P. BEAL.
S. L. JONES & CO.
v.
BENNETT et al.
No. 3406.
Circuit Court of Appeals, Third Circuit.
February 19, 1926.
Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for appellant.
Duncan & Mount, of New York City (Joseph K. Inness and Russell T. Mount, both of New York City, of counsel), for appellee Bennett.
Haight, Smith, Griffin & Deming, of New York City (Clarence Bishop Smith, of New York City, of counsel), for appellee Houlder Weir & Boyd, Inc.
Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.
WOOLLEY, Circuit Judge.
S. L. Jones & Company, the shipper, first libelled the steamship Thomas P. Beal for damage to cargo. It then filed a libel against Houlder, Weir & Boyd, Inc., the time charterer of the ship on the voyage in question. The first action was in rem; the second in personam.
*50 The shipper and charterer stipulated, as between themselves, that liability, should any be proved, was that of the charterer; and all parties stipulated that the libel against the ship should stand and the two actions be consolidated for the purpose of allowing the charterer, should the decree be against it, to litigate with the ship, without separate action, the question whose was the ultimate liability, that of the charterer or the ship. Thus the case presents two controversies: One between shipper and charterer and the other between charterer and ship. The trial court, finding the damage due to fault of the shipper in a matter within an exception of the bill of lading, passed only on the first question and, accordingly, entered a decree dismissing the libels. The shipper appealed.
Greatly compressed, the story of the case between shipper and charterer, told by facts which were admitted or uncontradicted and which, when controverted, have been found by this court, is as follows:
The cargo in question was Perilla oil, made in Japan, shipped in sound re-coopered second-hand barrels, stowed in the lower holds of trans-Pacific steamers and delivered in good order at a warehouse in San Francisco, there to await trans-shipment to New York. The shipper contracted with the charterer for the affreightment of the oil to New York by the steamship Thomas P. Beal, then taking on cargo at Puget Sound. While there, the charterer, having reserved ample under-deck space for San Francisco cargo including that of the shipper, cancelled the reservation and filled the space with lumber. The ship arrived in San Francisco with only two places available for cargo of any kind: One her cross-bunker next to the fire room and the other the forward end of her bridge deck space. The vessel was an oil burner convertible into a coal burner and the cross-bunker was provided, in the latter event, to carry bunker coal. The bridge deck space was on top of the main deck and on top of it were the houses, officers' quarters, etc.
On the arrival of the ship at San Francisco the shipper delivered to the charterer at its dock 800 barrels of oil for which the charterer's agents issued clean dock receipts and a clean dock permit. On their delivery leakage was discovered for the first time. Thereupon the pier coopers repaired 14 barrels and the shipper's coopers about 60 or 70 barrels. The charterer then put the cargo aboard and, stowing 455 barrels in the cross-bunker and 345 barrels in the bridge deck space, issued to the shipper a bill of lading containing the words "Second-hand barrels thoroughly re-coopered and in good condition." The bill of lading was prepared and presented by the shipper and was accepted and signed by the charterer after agreement between them in respect to 4 badly leaking barrels, evidenced by a letter from the shipper to the charterer as follows: "In consideration of your giving us a clean bill of lading free from any exceptions as to these particular four barrels, we will hold you free from any consequences arising therefrom."
The ship sailed from San Francisco late in July, passed through the Panama Canal, touched at Baltimore and arrived in New York on September 6, 1923. On being discharged, the cargo in question was found damaged, due to leakage. Of the 800 barrels, 59 were empty, 337 partly full and 401 entirely full. What happened to the remaining three barrels does not appear. This represented a shortage of 99,838 pounds out of 356,650 weight shipped, or a loss of about 28%. The greater leakage occurred in the part of the cargo stowed in the cross-bunker. Some leakage occurred in the other part stowed in the bridge deck space. The learned trial judge did not discuss in his opinion the unseaworthiness of the ship in respect to stowing the cargo in improper places, urged by the shipper as its ground of action, but being impressed by the fact of leakage both at the port of consignment and port of delivery, and particularly by the fact that leakage occurred in the cargo in both places in which it was stowed, found that the damage was due to the shipper's fault in delivering the cargo to the charterer in defective containers, and, leakage from this cause falling within an exception of the bill of lading, he dismissed the libels. On this appeal the shipper charges error to the court not only in its fact finding of defective containers but in its refusal to consider, or, if considered, in its failure to decide the question of the charterer's negligent stowage in places unsuitable for cargo of that character, as a matter within the bill of lading and, if found to exist, a matter on which the shipper had a right to recover. As a question of law arises here we pause to examine and state briefly the law applicable to the subject.
It is conceded that damage from leakage is an exception in the bill of lading. As to this, the charterer  in this instance the carrier  states the general rule to be that if a loss arise from an excepted peril the ship is excused, and there the carrier, in its *51 statement of the law, is inclined to stop. The rule, we think, goes further and is that where a loss arises from such a peril the ship is prima facie excused, yet it can be held liable on affirmative proof that negligence on the ship's part was the efficient cause of the loss. The Isla de Panay (C. C. A. 2d) 292 F. 723. Just here the shipper takes an odd position, which is, that if the carrier was guilty of negligent stowage, it is liable for the loss even if the containers which it (the shipper) had delivered to the carrier were not strong enough to hold the oil. In other words the shipper maintains, as matter of law, that notwithstanding its own negligence in supplying defective containers (should any be found) negligent stowage per se fastens liability on the carrier. This is not the law, for the question remains  whose negligence was the efficient cause of the damage? Negligence of the carrier is not actionable unless it caused the damage. If it did, it is actionable and the carrier is not, consistently either with Section 1 of the Harter Act (Comp. St. § 8029) or with the terms of the bill of lading relieved from liability for it wrongful act. If, however, the shipper caused the damage by supplying defective containers, the carrier, though negligent, is not liable for the consequences of the shipper's act. Liability therefore must be determined according as the damage is traced to the action of one party or the other party and found to be the result of the negligence of one or the other. Gilchrist Transp. Co. v. Boston Ins. Co. (C. C. A. 6th) 223 F. 716, 720, 139 C. C. A. 246; The Isla de Panay (C. C. A. 2d) 292 F. 723, 727; The Koranna (D. C.) 214 F. 172, 174; The Willdomino (C. C. A. 3d) 300 F. 5; The Wilton (D. C. S. D. N. Y.) 2 A. M. C. 1105, 1106, 1107, 10 F.(2d) 244.
In searching for this liability the nature of the transaction must first be looked into. Here it is a contract of affreightment which imposes upon the carrier the stringent obligation that the ship shall be seaworthy at the commencement of her voyage. This obligation relates not merely to her hull and her capacity to weather the perils of the sea but extends as well to her fitness and capacity to carry the cargo she has undertaken to transport. In other words, there is an obligation of seaworthiness in respect to stowage of cargo,  an implied warranty that the ship is seaworthy quoad that cargo. When sued by a shipper for damage to cargo, the ship (or a time charterer) cannot rely alone upon an exception in the contract of affreightment but, before availing itself of the exception, must sustain the burden of proving its primary obligation of seaworthiness in stowing the cargo in a berth reasonably fitted for cargo of that kind. The Southwark, 24 S. Ct. 1, 191 U. S. 1, 8, 9, 15, 48 L. Ed. 65; The Thames (C. C. A. 4th) 61 F. 1014, 1022, 1023, 1024, 10 C. C. A. 232; Kaufer Co. v. Luckenbach S. S. Co., Inc. (D. C.) 284 F. 160 and (D. C.) 294 F. 978; The Willdomino (C. C. A. 3d) 300 F. 5. The shipper in the case at bar, however, did not wait for the charterer to perform that duty but itself produced evidence of the ship's unseaworthiness in respect to stowage and sharply brought out the issue of the charterer's negligence.
As the charterer stowed the cargo in two places the question of negligent stowage naturally is divided into two questions; stowage in the cross-bunker and stowage in the bridge deck space. This cross-bunker was built primarily for the stowage of coal and it was used for that purpose when the ship was fired with that fuel. Being separated from the fire room only by a steel bulkhead, it was always warm, and when on a summer voyage through the tropics, as in this instance, it was hot. Having been built for stowage of coal, little ventilation was needed and little was provided. While it might have been a proper place in which to stow lumber, another part of the cargo, it was, according to the weight of the evidence, an improper place in which to stow cargo that would be affected and perhaps damaged by heat. In fact it was the hottest cargo space on the ship. The charterer was bound to know its probable temperature on the intended voyage and to know the effect of that temperature on the cargo of oil, an article which under normal conditions and with the best of cooperage always seeps through its containers and leaks in some degree.
On discharge of the cargo it was discovered that most of the leakage had occurred in the barrels stowed in the cross-bunker and most of this leakage had occurred at the barrel heads. The evidence shows very clearly that the charterer's servants stowed the oil in the cross-bunker and on the bridge deck because they were the only spaces available, in fact, the only cargo spaces left in the ship, and they did it without thought of the character of the cargo or without regard to the consequences. We are of opinion that this amounted to negligence, which was the proximate cause of the damage, for which the charterer, the carrier, is liable.
*52 Stowage in the bridge deck space presents an altogether different situation. While that probably was not the best space in the ship in which to stow oil, it has not been proved that it was an improper place. It was not below the water line and, in consequence, it was exposed at times to the heat of the sun. Moreover, insulated steam pipes, uncovered at the joints and flanges, ran through the space, and through the pipes live steam passed for several hours when the ship was in the Panama Canal and for several days when she was discharging cargo at Baltimore. Yet we hesitate to lay down a rule of ship transportation affecting what ordinarily is the business of the ship's owners or her charterer, varying always with circumstances of ship, cargo, season and climate and controlled in respect thereto by the applicable law of care and caution. Confining ourselves to the shipment in question, we are satisfied from the location of the cargo, its character and its condition on being discharged that the charterer was not negligent in stowing oil cargo in the bridge deck space. We base our judgment mainly on the testimony of McManus and Honam, coopers at the port of discharge who after describing the bad condition of the oil barrels as they came out of the cross-bunker  "they remained warm for two days"  stated in respect to the barrels that had been stowed in the bridge deck space: "They were coming out in fairly good condition;" "the big loss of oil took place in the cross-bunker;" "the loss was small in the other part of the ship (bridge deck), showed comparison right there;" "they came out fairly well;" "if the whole cargo had been shipped where the first lot was hadn't been in that bunker hatch they wouldn't have had any loss or very small if you had;" "I know 400 odd barrels came out of the bunker hatch and they were in bad shape;" "them were pretty good barrels that come out first (bridge deck);" "they were in very fair shape, very good barrel;" "then they started the cross-bunker hatch; there's where the trouble commenced."
We are aware that these opposite findings of negligence and no negligence in stowing the cargo in the two spaces is open to the observation that leakage occurred in both places and to the inquiry whether if so, was not the learned trial judge right in finding the fault that of the shipper in supplying defective barrels? The barrels were secondhand, which at first sounds bad. But they had been re-coopered and glued and there is testimony that in the trade barrels of that kind are regarded as being better than new barrels. At all events, it is not disputed that they were sound when shipped from the Orient and when they arrived in San Francisco. When delivered to the ship's dock, many were sweating and some were leaking. Some were re-coopered and the lot was accepted by the charterer as "thoroughly re-coopered and in good condition." At the port of discharge those that had been stowed in the bridge deck space were in "fair shape" and in "fairly good condition." Those that had been stowed in the cross-bunker were leaking and were in "bad shape."
The difference in the conclusions at which the trial court and this court have arrived is due, we surmise, to the difference in the premises from which they were drawn. The trial court took as the major premise the more or less leaky condition of the barrels at the time of loading and the fact that leakage on discharge was discovered in the cargo stowed in both places, and therefrom deduced the conclusion that the fault lay in the barrels. This court took for the major premise the fair condition of the barrels upon loading and on discharge the bad condition of those stowed in the place of high heat and the fair condition of those stowed in the place of less heat, and therefrom deduced the conclusion that the damage to the former was due to the excessive heat in the place of stowage and that the leakage in the latter was normal.
In the second aspect of this litigation, the remaining question is, who shall bear the loss, the time charterer of the ship or the owner of the ship?
On the issue of liability for bad stowage, as between the time charterer and the shipowner, the time charterer relies mainly on cases which hold generally, and very properly, that responsibility for the seaworthiness of a chartered ship is on the shipowner, British & Foreign Marine Ins. Co. v. Kilgour S. S. Co. (D. C.) 184 F. 174; Dunlop S. S. Co. v. Tweedie Trading Co. (C. C. A. 2d) 178 F. 678, 102 C. C. A. 173; Dene Shipping Co. v. Tweedie Trading Co. (C. C. A. 2d) 143 F. 854, 74 C. C. A. 606; Olsen v. U. S. Shipping Co. (C. C. A. 2d) 213 F. 18, 129 C. C. A. 607; Munson S. S. Lines v. Glasgow Navigation Co. (C. C. A. 2d) 235 F. 64, 148 C. C. A. 558; The Thames (C. C. A. 4th) 61 F. 1014, 10 C. C. A. 232. But that, generally, means responsibility for seaworthiness of the ship as against perils of the sea; it does not, in every instance, mean responsibility for her seaworthiness in respect to stowing cargo. Ordinarily, the *53 owner charters only the space; the ship continues in the possession, management and control of the owner and its officers and crew. But in this case of a time charterer, the charterer, in chartering the space, chartered the whole reach of the ship; the owner in terms put at "the charterer's disposal" her "holds, decks and usual places of loading." The charter party also provided that "the captain (although appointed by the owners) shall be under all the orders and directions of the charterer as regards employment, agency, or other arrangements" and stipulated that the owners shall provide the charterer "ropes, falls, slings and blocks necessary to handle ordinary cargo" and surrendered to the "charterer's disposal," during loading and discharging, the "ship's steam winches" as well as her "dunnage and shifting boards."
The terms of the charter party make it certain there was a letting of the ship as distinguished from a contract for her services. In the former case, the relation between owner and charterer becomes that of bailor and bailee; whereas, in the latter, the relation is that of carrier and shipper. Carver (4th Ed.) § 112; The Barnstable, 21 S. Ct. 684, 181 U. S. 469, 45 L. Ed. 954. According as it is one or the other the question arises  whose agents wrought the injury, and there is suggested the inquiry put by Lord Esher in 1 Q. B. 258: "When is a captain the owner's captain?" Transposing the question, we ask: "When is the captain the charterer's servant?" Directing these inquiries to the case in hand, it is clear that, within the law of The Santona (C. C.) 152 F. 516, 518, opinion by Judge Hough, while the owner did not surrender possession or control or command or navigation of the ship, "he has surrendered control of her freight and passenger capacity and handed the same over to the charterers for all lawful purposes. The ship [was] the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew [were] the servants of the chatterers." And so the parties in this case construed the charter party, for it is perfectly clear that the charterer, first at one port and then at another and finally at San Francisco, booked the freight, designated the places of stowage, did the stowing itself through its own stevedores, and assumed all responsibility therefor. On the issue between the charterer and the ship we find the charterer liable.
On the several findings indicated, the decree of the District Court in so far as it dismissed the libel against the ship and her receiver as claimant is affirmed, and it is reversed in the part denying recovery to the shipper, with instructions that the case be reinstated and the shipper allowed such damages as, after reference or otherwise, the court shall determine it sustained by reason of negligent stowing of cargo in the cross-bunker; costs of trial to be divided and taxed as the trial court shall decide; costs of this appeal to be divided and taxed one-half against the libellant shipper and one-half against the charterer.